Argued May 12, reversed and remanded June 15, 1960

# BRADFORD *v.* WESTERN OLDSMOBILE, INC.
## 353 P. 2d 232

*W. J. Masters* argued the cause for appellant. On the briefs were Masters & Masters, Portland.

*Frank E. Day* argued the cause for respondent. On the brief were Stern, Reiter, Day & Anderson, Portland.

Before McAllister, Chief Justice, and Warner, Sloan, O'Connell and Millard, Justices.

MILLARD J. ( Pro Tempore)

In this case defendant appeals from a judgment in favor of the plaintiff rendered in the circuit court of Multnomah county for $911.80 general damages and $4,000 punitive damages and costs, based upon a jury verdict returned in an action for alleged conversion of an Oldsmobile previously sold by defendant to plaintiff under a conditional sales contract.

Briefly, plaintiff's complaint, after alleging ownership and right to possession of the automobile and its value, claims that on May 23, 1957, the defendant wrongfully and unlawfully took the car from plaintiff and converted it to its own use, to plaintiff's damage in a specified sum, and that such action was done intentionally, maliciously and in wanton disregard of the rights and feelings of plaintiff and asks for punitive damages in the sum of $50,000. These allegations

were denied by defendant in its answer. In addition, defendant alleges in effect that the automobile was sold by defendant to plaintiff on May 18, 1957, pursuant to a written contract of conditional sale executed for the principal sum of $4,272.16, after certain additions and credit for a trade-in allowance of $911.80 for plaintiff's equity in a Ford car, and the balance was to be paid as follows: $300 on May 20, 1957, $100 on June 2, 1957, and $107.56 per month commencing July 2, 1957, until 36 instalments had been paid. Title was also retained in the seller who was also given the usual remedies provided in such contracts, including the right to repossess the vehicle in the event of default by the buyer in the payment of the indebtedness or any part thereof, time and strict performance being of the essence. Defendant further alleges that plaintiff, being in default in payment of installments, on demand turned the Oldsmobile back to the defendant. Plaintiff in his reply denies these allegations and in addition sets forth affirmative matter in which he attempts to invoke the doctrine of estoppel in which he inferentially admits that he agreed to enter into such a contract but in effect says that he was induced to do so because of fraudulent misrepresentations in that defendant represented, promised and guaranteed that it would secure a loan for plaintiff in the sum of $300 from a finance company in order that he could make the payment due May 20, 1957, and that defendant would guarantee plaintiff that such a loan could and would be obtained because it had checked plaintiff's credit and found it to be excellent, had checked plaintiff's financial statement and found it to be accurate and had verified the pay-off balance on plaintiff's Ford automobile which was being traded in as a down payment. He further says that these promises were

knowingly false and made for the purpose of inducing plaintiff to rely thereon; that plaintiff did rely thereon and executed a purchase order although defendant then knew that plaintiff did not have, nor could he raise, the money to pay the $300 payment. Plaintiff in addition says he was willing to sign all documents and do whatever was necessary to obtain the loan but that defendant defaulted in its promise and would not assist plaintiff in obtaining the loan and funds with which to make such payment, but instead repossessed the Oldsmobile, and that defendant should be estopped from asserting plaintiff was in any way in default in his contract.

As one of its assignments of error defendant contends that the court erred in denying the motion of defendant for a directed verdict and as one of the grounds, contends there is no estoppel as shown by the evidence viewed in the light most favorable to plaintiff.

Viewing the evidence in that light it appears that plaintiff did execute the conditional sale contract as alleged, trading in the equity in his Ford car as a down payment, and that he did not have, nor was he able to raise, the $300 payment which he agreed to pay May 20, 1957. Plaintiff testified that defendant through one of its agents made the statement to the effect that he "guaranteed me the loan. You said you would assist me in every manner proper to get the loan." Plaintiff further testified that, "He told me I would need $300 additional. I said I didn't have it. He said he had a tie-in with Budget Finance Company, arrange a loan for me." Plaintiff also stated that after talking it over with his wife, he told defendant's representative, "Well, okay; if you can guarantee me the loan, let's write it up," and that thereafter said repre-

sentative stated: "Jim, you have nothing to worry about. I guarantee the loan," and again, "I have checked everything, your credit is as good as gold. You have not a thing to worry - - -." Thus, along with other evidence, it clearly appeared that plaintiff would not have entered into the conditional sales agreement or consummated the transaction unless he was assured of obtaining a loan from a finance company.

■ It further appears that defendant did repossess the automobile and that at the time plaintiff was in default as to the $300 payment. So, assuming that all the elements of estoppel are present and proved, with exception of reliance, did plaintiff have a right to rely on defendant's misrepresentations? It is the duty of the "representee to use some manner of protection and precaution to safeguard his interests." *Hansen v. Holmberg,* 176 Or 173, 184, 156 P2d 571. From this case it appears that while this court is committed to the general policy that it is better to encourage negligence in the foolish than fraud in the deceitful, it must still appear that "Plaintiff reasonably believed them [the representations] to be true." *Wheelright v. Vanderbilt,* 69 Or 326, 328, 138 P 857.

■ Here it appears that all the documents relating to the consummation of the transaction of sale were signed at about the same time. Thereafter there was prepared and included a purchaser's statement of financial condition which plaintiff signed, knowing it was going to be used to obtain the projected loan of $300 from the finance company. This statement was filled out prior to the consummation of the transaction by plaintiff supplying the information which was written in by defendant's representative.

On this statement entries were made showing that

plaintiff was employed by Broadway Cab Co. and a life insurance company; that his income was $500 per month; that he had $110 other monthly income from property; that his spouse earned $200 per month, and that he owned his own house clear of any mortgage. In truth he had only been employed by the cab company two days, and his salary was $350 per month. While he then had a right to sell life insurance, his agent's card was cancelled a few days thereafter for inactivity. The additional income of $110 did not accrue to him but to his wife, who was not a party to the transaction. He did not own his house, but his wife was buying it on contract, and there was an unpaid balance. Plaintiff testified that, "I told the man when he made out the credit statement, I started to work with Broadway Cab a—only been with them two days."

Plaintiff further testified in answer to questions from his own counsel as follows:

"Q And when he asked you the name of your employer, what did you tell him?
"A I told him Broadway Cab.

"Q And what did you say about Beneficial Standard Life Insurance Company?
"A I told him that I got my license the previous November, and was just dabbling in insurance part-time because I was just learning.

"Q And did you tell him how long you had been with Broadway Cab Company?
"A Absolutely, the two days.

"Q And when he asked you about your monthly income, what did you tell him?
"A I told him that a cab driver could earn about $350 a month.

"Q   And what did he say about that?

"A   Well, he said, 'let's put in $500,' he said, 'it will look better to the bank.' He said, 'it won't mean anything, but look better.'

"Q   Did you have—also have some income in addition to this $350. from the Broadway Cab; from the Beneficial Standard Life Insurance Company from selling insurance on the side?

"A   Like I explained to Mr. Golling, I figured that I could get $100. on the side selling insurance. It was all estimated income.

"Q   I see. And did you tell him that your wife had additional income from property of $110. a month?

"A   Yes, I did.

"Q   And did you tell him that your wife had an income of $200. a month?

"A   She was working, yes.

"Q   And did he ask you whether or not you were renting your house you were living in?

"A   I told him the house was clear.

"Q   You told him that you owned your own home?

"A   That is, my wife did, yes. Wasn't in my name.

"Q   I see. And was that true?

"A   No. I found out after that—that she was buying it on contract.

"Q   I see. How long have you been married, very long?

"A   Just married the previous November.

"Q   And you were living in a house that belonged to her; that is, buying on contract?

"A   Yes.

"*   *   *   *   *

"Q (by Mr. Masters) Mr. Bradford, you have down here on this credit statement that you signed, that your monthly income was $500. Was that true?

"A It was not true.

"Q It was not true?

"A As—

"Q No?

"A No.

"Q As a matter of fact, you had not been active in selling insurance to something previous to May?

"A I told Mr. Golling simply I was dabbling in it part-time, than that in fact—

"Q And isn't it true that the life insurance company cancelled your license because of lack of activity on your part?

"A Correct.

"Q And you weren't earning $500. a month from Beneficial Standard Life Insurance Company?

"A I told Mr. Golling I wasn't.

"Q How long had you been working for Broadway Cab Company?

"A Two days.

"Q How much were you earning there?

"A I give Mr. Golling an estimated income. That is all I could give him.

"Q You signed this, that your income was $500 a month?

"A I signed it, yes.

"Q Is that right, it wasn't true?

"A Of course it wasn't true.

"Q Now, you have here that you have other income of $110. a month, was that true?

"A I told Mr. Golling that was my wife's income.

"Q Now, there is a space here where it has spouse's monthly salary of $200.

"A That is right. She was working.

"MR. W. J. MASTERS: That is all.

"CROSS-EXAMINATION
BY MR. DAY:

"Q Now, with regard to your monthly income, you say that that is not true, but is that a fair estimate of what you expected to make?

"A I told Mr. Golling—just a minute.

"Q With regard to this income, you said $500. was not a true income, was that a fair extimate [sic] of what you expected to earn from the combined income from Beneficial Standard and Broadway Cab?

"A No.

"Q I believe you testified on direction [sic] examination that you expected to make $450. between the two?

"A In the neighborhood of $350. to $400.

"Q You testified Monday—yesterday, did you not, that you expected to make $350. from the cab company?

"A Approximately, yes, estimated.

"Q And approximately $100. on the side from the insurance company?

"A That is right.

"Q So that your combined income would be about $450.?

"A That is right.

"Q Other than her salary?

"A Yes.

"Q Along with all those papers that I handed you, does that refresh your memory as to when your license was terminated?

"A Yes, it does.

"Q  When was your license terminated?

"A  On May 23rd, 1957.

"Q  On May 18th did you have any idea your license was to be terminated?

"A  I did not.

"Q  And you received written notice of that effect after you gave this statement to Mr. Golling, is that right?

"A  Yes.

"MR. DAY: I have nothing further at this time.

"REDIRECT EXAMINATION

BY MR. W. J. MASTERS:

"Q  Did you tell Mr. Golling at that time that you were just dabbling in insurance?

"A  I did.

"Q  But you signed this credit statement showing that you had an income of $500, when you knew you didn't have that income, is that correct?

"A  True.

"MR. W. J. MASTERS: I have no further questions.

"Q  (by Mr. Masters)  One more question I would like to ask in relation to that credit statement. You stated that you were married when, Mr. Bradford?

"A  November of '56.

"Q  And, been married about six months when you signed the credit statement?

"A  Well, from November to May.

"Q  And you stated in the credit statement that you owned your home clear of any mortgages or other liens, and that it was worth $7,500., is that correct?

"A  Well, I wish to correct you on that. I told Mr. Golling that my wife owned the home and I thought it was clear. I did not say that I owned the home.

"Q Did you sign the credit statement that you state you owned the home?

"A I told him—I told Mr. Golling that my wife owned the home purchased in May of '53. The home was not in my name.

"Q There is a box here marked 'real estate, rent or own' and it's checked 'owned.' Then it says, 'landlord (if renting)' and you have it says, 'own home, $7,500.' and 'mortgage, if any'—'clear.'

"And your statement is now that you didn't tell him that you owned the home, that your wife owned the home?

"A I did at the time the statement was made out.

"Q Did you read the statement before you signed it?

"A He asked me if I myself owned the home and I told him my wife."

Defendant's representative testified in effect that the answers written down were as given him by the plaintiff. It further appears that defendant's agent tried to secure a loan from several finance companies but was turned down, defendant's representative testifying that it was on account of "discrepancies in the purchaser's statements." Plaintiff called two finance companies and was also turned down, so a loan did not result.

Plaintiff listed his occupation as a salesman. He had a limited experience selling automobiles. According to his own testimony, he knew that incorrect answers were being supplied in the financial statement to some extent and, of course, he knew that his wife was not a party to the agreement nor to the statement. Even viewing the evidence in the light most favorable to him, there was sufficient to indicate to him that it was the purpose to present misinformation

in a financial statement in an effort to obtain a loan, and he entered into the attempted fraudulent scheme. Under such circumstances he could not reasonably have believed that a loan could be obtained or would be guaranteed. In *Dunning v. Cresson,* 6 Or 241, 242, the court quoted with approval 1 Story Eq Jur § 202, as follows:

"The party must be misled by the misrepresentations, for if he knows it to be false when made it cannot be said to influence his conduct, and it is his own indiscretion and not any fraud or surprise of which he has any just complaint to make under such circumstances."

See also *Bailey v. Frazier,* 62 Or 142, 149, 124 P 643. In 37 LRA 593, which is an annotation dealing with the problem of the right to rely on fraudulent representations made to effect a contract, it is stated at page 595 as follows:

"If the party claiming to have been defrauded knew that the statement was false, or if the facts concerning which the statement was made were perfectly obvious, no claim can be made that reliance was placed on the statement." (See cases there cited.)

In 37 CJS 273, 274, Fraud § 30, it is stated:

"Indeed  *  *  *  it has been broadly held that the fraud-feasor may not excuse his wrongful conduct by claiming that the party was unduly credulous or contributorily negligent in relying on the representation. Even under this view, however, recovery will be denied when plaintiff could have discovered the falsity of the representations by the use of his senses and judgment or by the exercise of ordinary powers of observation."

Even when assured that the suspicious circumstance is erroneous, it has been stated that one who

has learned of the falsity of one or more representations is under a legal duty to make a complete investigation and may not rely on the representations made. See 37 CJS 276, Fraud § 31, note 46, and cases there cited. See also 23 Am Jur 951, Fraud and Deceit § 146, and notes 18 and 19. See also ORS 165.615, which provides it is a crime to knowingly make or cause to be made either directly or indirectly or through any agency any false statement in writing with intent that it shall be relied upon respecting one's financial condition or ability to pay. We hasten to add that one who knowingly aids or abets another in the preparation of such a statement could also be charged as a principal.

In *Carlon v. First Nat. Bank*, 80 Or 539, 544, 157 P 809, this court quoted with approval from Bigelow on Estoppel, p 583, as follows:

"* * * indeed, it is said that where the conduct supposed to have created an estoppel was brought about or directly encouraged by the party alleging the estoppel, no estoppel is created."

See also 19 Am Jur 740, Estoppel § 86.

██ Further, no one can base an estoppel upon an act of the opposite party induced by his own fraud. *McMartin v. Continental Ins. Co.*, 41 Minn 198, 42 NW 934, 935. As respects estoppel, reliance is not justified where knowledge to the contrary obtains. *State ex rel. v. School District No. 9*, 148 Or 273, 288, 31 P2d 751, 36 P2d 179.

And so in this case we hold there is insufficient evidence justifying reliance on defendant's claimed guarantee to obtain a loan. Since reliance is a material element of estoppel, we further hold that plaintiff has failed to establish this defense. There is no sub-

stantial evidence to indicate that the conditional sale contract was other than was agreed upon, and since plaintiff in fact affirmed the contract by refusing voluntarily to return the Oldsmobile and because he was in default at the time of repossession, we hold that the court erred in not directing a verdict for the defendant. It, therefore, becomes unnecessary to review the other assignments. We do not by our ruling intend, however, to indicate that we thoroughly approve of the business practice of defendant as exemplified in this case.

Since plaintiff, under our ruling, was not entitled to actual damages, it follows that he is not entitled to punitive damages.

The judgment for plaintiff is, therefore, reversed and the cause remanded with instruction to enter a judgment for defendant.