Argued September 7, affirmed October 9, 1972

ORMSBEE, *Respondent, v.* SMEJKAL ET AL, *Appellants.*

501 P2d 1267

*Gary D. Rossi,* Coos Bay, argued the cause for appellant.

*Carl N. Byers,* Salem, argued the cause for respondents Shiplee.

TONGUE, J.

This is an interpleader suit to determine the interests of the defendants in money received by plaintiff from rent on premises known as The Broiler in North Bend, Oregon. Defendants Smejkal and Boekelman claim the money as the alleged lessors of the

---

Holman, J., did not participate in this decision.

120

premises, alleging that they sublet the premises to the present tenant. Defendants Shiplee claim the money as due to them as owners of the hotel building in which The Broiler is located.[1]

The trial court, after hearing testimony entered a judgment and decree that defendants Smejkal and Boekelman have no interest in the money or premises and that defendants Shiplee are owners of the real property occupied by The Broiler and are entitled to all such rental payments. Defendant Smejkal appeals.[2] We affirm.

Before considering the contentions by appellant it is necessary to review the conflicting testimony relating to the extraordinary, if not somewhat incredulous, real estate transaction involved in this case.

*The parties involved.*

Defendant Shiplee was a jeweler in North Bend and had owned the North Bend Hotel for some time.

---

[1] On trial it was stipulated that the case be tried as a suit in equity and that the court might determine the rights and liabilities of the parties not only to the rental payments, but also to the premises themselves, and might base its determination on law or equity as the case may be or by the exercise of its powers under ORS ch 28, relating to Declaratory Judgments.

[2] The following errors are assigned by defendant Smejkal:

(1) "The Court erred in not holding that Defendant Smejkal changed his position in reliance upon Defendants Shiplee executing the land sale contract consenting to leasing by their buyer; and that Shiplees should be estopped to deny Smejkal's lease on 'The Broiler' premises."

(2) "The Court erred in holding that the Defendant, James Smejkal has neither right, title or interest in or to the premises known as 'The Broiler', nor in the sums held by Plaintiff as rental payments on said premises."

(3) "The Court erred in not declaring that the Defendants Shiplee were the owners in fee of the North Bend Hotel subject to the leasehold of Defendant Smejkal in and to the premises known as 'The Broiler'."

The hotel itself had been leased to a Mr. Cowden and that portion of the building known as The Broiler had been leased by Kinwood, Inc. Mr. Shiplee had not previously known defendant Smejkal and also had not previously known defendant Tuffy Boekelman (who filed no appearance in this case), except for his reputation as a "loan shark" and a "go-between."

According to Mr. Boekelman, Mr. Cowden asked him if he could raise money for Cowden to buy the hotel. Mr. Boekelman then interested Mr. Smejkal in putting up the money for a down payment. On about May 10, 1970 Mr. Boekelman went with Mr. Cowden to see Mr. Shiplee.

*The written documents prepared by counsel.*

In May 1970 Mr. Shiplee had his attorney, Mr. Wallace Johansen, prepare a proposed contract of sale. Mr. Johansen is now deceased. Mr. Cowden did not testify.

Mr. Boekelman got a copy of the contract from either Shiplee, Johansen, or Cowden. He and Mr. Smejkal then went to see attorney Lynne McNutt to discuss the contract with him. Mr. Cowden apparently did not consult an attorney.

The contract, as prepared by Mr. Johansen, provided for the sale to Mr. Cowden of the hotel property for $93,000, with a down payment of $5,000 and the balance payable in monthly installments.

According to Mr. McNutt, he was asked by Mr. Boekelman whether, in the event of default by Mr. Cowden, Mr. Shiplee could resort to rental payments on any leases and whether that would conflict with Mr. Smejkal's apparent interest in taking a lease on The Broiler.

Mr. McNutt then prepared a new page 10 to be added to the proposed contract of sale and which provided that "[b]uyers, or their successors in interest, may lease and sublet portions of the described premises" and that sellers would be "bound by such leases," although having "recourse to unpaid rentals under such lease agreements" in the event of buyer's default. This was done on May 18, 1970, according to Mr. McNutt.

Mr. McNutt also prepared a proposed "assignment" from Cowden to Boekelman and Smejkal to be effective as of May 15, 1970 of an undivided one-half interest in the real property subject to that contract and Cowden's interest in that contract. Mr. McNutt did not recall when it was prepared and whether before or after the sales contract was prepared. However, it was dated May 15, 1970, the same date as the sales contract.

A "lease agreement" was also prepared by Mr. McNutt, dated June 19, 1970 from Cowden, as lessor, to Smejkal and Boekelman as lessees, of The Broiler premises for a period of 10 years for $6,300 as prepaid rent, with option to renew for another 10 years. He could not recall when this lease was prepared, but testified that it would have been prepared within two or three days prior to June 19, 1970 if he followed his usual custom.

In addition, Mr. Orrin Ormsbee, a partner of Mr. McNutt, as attorney for Kinwood, Inc., prepared a new five year lease of The Broiler premises to Kinwood, naming Cowden, Boekelman and Smejkal as the lessors at $300 per month for the first 24 months and a minimum of $450 per month for the last 36 months. That lease was signed and dated June 18, 1970.

*The execution of the sales contract.*

The testimony relating to dates, conversations and understandings at the times these various documents were signed is conflicting, to say the least.

Apparently Mr. Boekelman and Mr. Smejkal went to the house of Mr. Shiplee on May 19, 1970 with the proposed contract of sale from Shiplee to Cowden, as prepared by Mr. Johansen. However, page 10, as prepared by Mr. McNutt, had been inserted in that contract.

Mr. Smejkal testified that at that time he and Mr. Boekelman "had a consummated, executed agreement with Mr. Cowden" consisting of a paid up lease of The Broiler for 10 years for $6,300, with option to renew, and that he would not have put up the $5,000 as a down payment for Mr. Cowden "had I not had a signed agreement on The Broiler." He also testified that this lease was "dependent" upon the deal going through with Shiplee.

■ Thus Mr. Smejkal would have the court believe that this so-called "prepaid lease" was executed by Mr. Cowden before the contract of sale from Shiplee to Cowden was executed. The pre-paid lease, however, was dated June 19, 1970 and, according to the testimony of Mr. McNutt, was probably not even prepared until two or three days before that date. Furthermore, if the lease had been previously prepared, it would be expected that Mr. McNutt would have made specific reference to it in preparing page 10 as an insert for the contract of sale. Accordingly, the trial court could properly find, and we find, that this testimony by Mr. Smejkal was not true.

Mr. Smejkal also testified that he and Mr. Boekelman had Mr. Shiplee "read over" the contract and

sign it (with page 10 previously inserted) after making a slight change in page 10 and having Shiplee initial that change. At the same time, Smejkal paid $5,000 to Shiplee for the down payment.

Smejkal was asked on trial whether he and Boekelman told Shiplee that they had a pre-paid lease from Cowden on The Broiler for 10 years, with the result that, according to the new page 10, Shiplee would have to honor that lease even if Cowden defaulted on the contract, with no recourse to any further rental payments. Smejkal's answer was evasive and he said "No, I can't say, but he was made aware, yes." He admitted, however, that he did not tell Shiplee that the $5,000 paid by him as a down payment on the contract was also considered by him to be part of the $6,300 pre-paid rental to Cowden. At that point Smejkal also admitted that "I don't think I told him I already had it" (i.e., the pre-paid lease).

Mr. Tuffy Boekelman, who apparently "did most of the talking," testified that he had previously told Shiplee that he knew someone who would be willing to put up some money (for a down payment) and was "very interested in getting a lease on The Broiler"; but that in order for Smejkal to "go along," "we were going to lease The Broiler," (meaning Smejkal and Boekelman) and wanted a clause in the contract to protect that lease in the event that Shiplee repossessed from Cowden. He also testified that Shiplee agreed and said to have his lawyer make it up that way; and that he then went to Mr. McNutt, who prepared a new page 10.

Mr. Boekelman testified that when they later took the contract to Shiplee's home they "read it to him," referring to the new page 10, and told him that they (Boekelman and Smejkal) were "putting up the money

to take the lease on The Broiler." He admitted, however, that he didn't tell Shiplee that by approving that addition he was approving a pre-paid lease on The Broiler for approximately $50 per month for up to 20 years.

Mr. Boekelman also testified, as did Mr. Smejkal, that although the pre-paid lease was dated June 19, 1970 it was drawn at the same time that page 10 was prepared for the sales contract and was also signed by Cowden on the same day. For reasons previously stated, the trial court could properly find, and we find, that this testimony was not true.

According to the testimony of Mr. Shiplee, however, neither Boekelman nor Smejkal told him of their intention to take a lease on The Broiler. On the contrary, he testified to the understanding that the interest of Boekelman and Smejkal was that "they were going to go into the hotel business" with Cowden, although not as purchasers of the hotel. This, of course, is consistent with the document for assignment by Cowden to Boekelman and Smejkal of a one-half interest in the hotel and in Cowden's interest in the sales contract.

Shiplee testified that he did not read the contract, including the new page 10, at that time because he had previously read it when it was prepared by his attorney and because he was told by Boekelman and Smejkal that there were no changes made, no additions. He also testified that he apparently initialed the slight changes on page 10 but did not know that page 10 had been added; that no one read that page to him and he did not understand what it meant, but initialed the changes on that page because he "thought they were honest," and that he would not have signed the contract if he had understood the effect of page 10.

Although some of the testimony of Mr. Shiplee, on cross-examination, was somewhat inconsistent with the foregoing (such as testimony that he signed the contract subject to "reapproval" by his attorney and that he did not rely upon what they told him) the trial court was entitled to believe his previous testimony and after examining the entire record we also believe it to be true.

After obtaining the signatures of Mr. Shiplee and his wife on the sales contract, Boekelman and Smejkal took it to Cowden for his signature. Smejkal testified that he then paid Cowden $1,300 which, in addition to the $5,000 paid by Smejkal to Shiplee as a down payment on the contract, made by the $6,300 claimed by Smejkal to constitute payment in full for the "pre-paid lease."

The signed contract of sale, dated May 15, 1970 was apparently then delivered to Mr. Johansen. At least it was included in his file on the matter. Significantly, that file also included, attached to the contract of sale, an original copy of the assignment by Cowden to Boekelman and Smejkal of a one-half interest, also dated May 15, 1970, and signed by Cowden, but not by them.

*Execution of leases—subsequent default.*

On June 18, 1970, one month after the contract of sale was signed, the lease agreement to The Broiler was executed, naming Cowden, Boekelman and Smejkal as lessors and Kinwood, Inc. as lessees. Payments under that lease, however, were to be made to Boekelman and Smejkal. Mr. Ormsbee, who prepared that lease as attorney for Kinwood, testified that when he did so he had no understanding that there was a sub-

lease (as contended by Boekelman and Smejkal) but that, on the contrary, it was his understanding that they owned or were acquiring some interest in the entire hotel premises, including The Broiler.

As previously stated, the so-called pre-paid lease of The Broiler from Cowden to Boekelman and Smejkal was dated June 19, 1970, the following day and, according to Mr. McNutt, who prepared it, was probably not even prepared until two or three days prior to that date. Mr. McNutt recognized that its terms were "rather remarkable" and stated that Smejkal wanted to "have some kind of a lease upon The Broiler and sub-lease it and secure his money" (i.e., the $6,300 paid by him). When asked whether this document was intended to be a "security device," his answer was that "it was a device by which Mr. Boekelman promoted that much money to help get the hotel sale or so forth going."

On December 3, 1970, after the failure of Cowden to make payments due under the sales contract, he executed a quitclaim deed back to Shiplee of the entire hotel premises, including The Broiler. Meanwhile, Kinwood, as lessee under the lease from Cowden, Boekelman and Smejkal, as lessors, made rental payments to plaintiff, who paid these funds into court and filed this interpleader proceeding.

On April 10, 1971 Boekelman executed an assignment to Smejkal of his interest in the so-called "prepaid lease."

*Defendant Smejkal is not entitled to The Broiler premises or rental payments.*

The claim of defendant Smejkal to The Broiler premises and to the rental payments under The Broiler

lease rests upon the following assumptions: (1) that the alleged "paid-up lease" from Cowden to Smejkal and Boekelman was a valid lease; (2) that the lease from Cowden, Smejkal and Boekelman to Kinwood, Inc. was a sub-lease from Smejkal and Boekelman; and (3) that the provisions of page 10 of the contract of sale from Shiplee to Cowden (under which Shiplee would be "bound by such lease," with "recourse" only to "unpaid rentals") were either valid and enforceable or that Shiplee was estopped to claim otherwise.

■ After reviewing the record, we are inclined to the belief that the so-called "pre-paid lease" of The Broiler was in fact intended to be a security arrangement. It is not clear whether that document was intended to secure the payment of $6,300 by Smejkal to Shiplee and Cowden or to secure the claim of Smejkal and Boekelman to an interest in the entire hotel. We believe, however, that it was not intended to be a bona fide "pre-paid lease," so as to entitle Boekelman (for no visible consideration) and Smejkal (for payment of $6,300, including the $5,000 down payment) to claim to have "sub-leased" The Broiler premises for a five-year term for minimum rentals totaling $23,400. We do not regard the testimony of Smejkal and Boekelman to the contrary as credible evidence and apparently the trial judge was of the same view.

Under this view of the record, the rights of Smejkal to The Broiler premises and rental payments would depend on his interest as one of the named lessors (together with Cowdwen and Boekelman) in the lease to Kinwood, Inc. As previously stated, Boekelman has assigned all of his interest to Smejkal, and Cowden (who did not testify) gave a quitclaim deed to Shiplee.

If, however, the provisions of page 10 of the land sales contract were either invalid or unenforceable by Smejkal, and if Shiplee is not estopped by approval of such provisions to deny the claim of Smejkal to the contrary, then Shiplee, as owner of the leased premises (both originally and as a result of the quitclaim deed from Cowden), is entitled to The Broiler premises and rental payments regardless of the validity of either of such leases.

■ After a de novo review of the entire record, we find that at the time of the quitclaim deed to Shiplee from Cowden he was entitled to rescind the contract of sale to Cowden for any one of the following reasons: (1) upon the ground that Boekelman and Smejkal, as agents for Cowden in negotiating the execution by Shiplee of the contract of sale, were guilty of false and fraudulent misrepresentations, at least by half-truths and concealment. *Heise et ux v. Pilot Rock Lbr. Co.,* 222 Or 78, 89, 352 P2d 1072 (1960); (2) upon the ground of unilateral mistake by Shiplee under circumstances such that Boekelman and Smejkal, as reasonable persons, should have known of such mistake by him. *G.E. Supply Corp. v. Republic Cons. Corp.,* 201 Or 690, 693, 272 P2d 201 (1954); or (3) upon the ground that Shiplee's mistake was induced by artifice or misrepresentation by Boekelman and Smejkal. 3 Corbin, Contracts (perm ed) 666, § 607.

The record is not entirely clear as to the facts under which that contract was terminated and a quitclaim deed executed by Cowden to Shiplee. The attorney who handled that transaction is dead and Cowden did not testify. There is little, if any, evidence that Shiplee foreclosed that contract, thus relying upon its validity. Under the record in this case, however, we

hold that the land sales contract between Shiplee and Cowden has either been terminated by rescission, rather than by enforcement of its provisions for foreclosure, or that because of the fraud and other inequitable conduct by Boekelman and Smejkal in its execution the contract is unenforceable by either of them in a court of equity. McClintock on Equity (2d ed) 61, § 26; Eaton on Equity (2d ed) 65, § 20; 2 Pomeroy's Equity Jurisprudence (5th ed) 105, § 401. See also *Merimac Co., Inc. v. Portland Timber,* 259 Or 573, 488 P2d 465 (1971).

██ It is contended by defendant Smejkal that defendants Shiplee are estopped to deny the validity of the land sales contract, including the provisions of page 10. In order to claim such an estoppel, however, it was necessary that Smejkal prove that he relied upon representations or conduct by Shiplee and that he had a right to so rely. This he failed to do. In addition, no one can base an estoppel upon the act of an opposite party induced by his own artifice or misrepresentation, as in this case. *Bradford v. Western Oldsmobile,* 222 Or 440, 452, 353 P2d 232 (1960). See also *Willis v. Stager,* 257 Or 608, 619, 481 P2d 78 (1971).

Shiplee may have been negligent in signing the contract of sale without reading it again, so as to discover the addition of the new page 10, as inserted in the contract by Boekelman and Smejkal. However, as stated in *Hansen v. Holmberg,* 176 Or 173, 184, 156 P2d 571 (1945), "* * * it is better to encourage negligence in the foolish than fraud in the deceitful."

It follows, in our opinion, that the trial court was correct in holding that defendant Smejkal has no right, title or interest in The Broiler premises or

rental payments; that defendant Shiplee and his wife are the owners of such premises and are entitled to such rentals, including rental payments paid by plaintiff to the clerk of the court.

It may be that defendant Smejkal may have some claim against defendant Shiplee or against Cowden for the $6,300 paid to Shiplee and Cowden. Because, however, the sole and only issue as presented by the parties to the court in these interpleader proceedings was the question whether defendant Smejkal or defendants Shiplee were entitled to The Broiler premises and rental payments and because the sole basis for the claim of defendant Smejkal was that he was the lessor of such premises, we express no opinion on that further question.

Affirmed.