942 F.2d 791
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
GEORGE HAMMERSMITH, INC. Plaintiff-Appellant,
v.
TACO BELL CORPORATION, Defendant-Appellee
 No. 90-35460.
 United States Court of Appeals, Ninth Circuit.
 Submitted July 12, 1991.*
Decided Aug. 15, 1991.
 
 Appeal from the United States District Court for the District of Oregon, No. CV-87-00711-Re; James A. Redden, District Judge, Presiding.
 D.Or.
 AFFIRMED.
 Before ALARCON, FERGUSON and CYNTHIA HOLCOMB HALL, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Hammersmith sued Taco Bell after it refused to renew his franchise agreement and altered the terms of his ongoing franchises based on an amendment. Although a jury awarded Hammersmith $2.9 million on his claims of fraud and bad faith, the district court granted Taco Bell's motions for judgment notwithstanding the verdict ("JNOV") and a conditional new trial. The court also dismissed Hammersmith's claims for promissory estoppel and breach of oral contract, denied his motion to file a fifth amended complaint, and found that Taco Bell had not violated the California Franchise Investment Law. We agree and affirm all rulings below.
 
 FACTS
 
 3
 Plaintiff George Hammersmith, Inc. ("GHI") is in the business of owning and managing several Taco Bell restaurant franchises.[1] In 1967, Hammersmith opened his first Taco Bell restaurant in Portland, Oregon ("Unit 168"), under a twenty-year franchise agreement which called for royalty payments at eight percent of sales for the first ten years and only two percent for the second ten. Between 1972 and 1985, Hammersmith acquired and operated five additional restaurants, each carrying different royalties. Each franchise agreement committed the franchisee to submit to frequent inspections and maintain passing scores in "QSC," which stands for "Quality, Service, and Cleanliness."
 
 
 4
 About 1983, Taco Bell asked its franchisees to contribute to a national advertising and marketing campaign through a program known as the "Winning Edge Pledge." Low-paying franchisees like Hammersmith were asked to increase their contractual royalties and contribute an additional advertising fee to fund the program. Hammersmith was asked to raise his royalties for Unit 168 from two percent to five and a half percent (5 1/2 %), and to pay an additional four and a half percent (4 1/2 %) as a marketing fee on all his sites.[2]
 
 
 5
 At trial, Hammersmith testified as follows. Taco Bell's franchise representative William Nesemeier met him during a coffee break at a convention in Hawaii in November, 1983, and promised him that the twenty-year agreement for Unit 168 would be unconditionally renewed if he agreed to the amendments. Hammersmith was also assured that he would receive credit for the excess royalties paid against the lump-sum fee normally charged to successor franchises. Hammersmith also testified to a meeting in Wilsonville, Oregon in April 1984, where Nesemeier again assured him that his franchise would be renewed if he signed up. According to Hammersmith, Regional General Manager Robert Whitelock silently acquiesced and did not contradict or correct Nesemeier's assurances.[3]
 
 
 6
 Throughout this period, both Taco Bell and Nesemeier sent Hammersmith several packages of documents regarding the proposed marketing program, proposed amendments to current franchise agreements, and Taco Bell's successor franchise policy.[4] At least four of these documents mentioned that adequate QSC was a condition of renewal. Nonetheless, Hammersmith ignored the documents. Relying on Nesemier's alleged unconditional verbal guarantee, he signed the amendments in September 1984.
 
 
 7
 About a year later, Hammersmith sought to expand his operations by opening a seventh restaurant. He obtained "operational approval" to do so in January 1986. This was valid for six months. In March, he received a "commitment letter" approving the renewal of the Unit 168 franchise provided that Hammersmith acquired a new site with the requisite drive-through capacity and fulfilled other requirements, including site approval by the Taco Bell Real Estate Site Acceptance Committee ("RESAC"). In reliance on the letter, Hammersmith purchased a new site, applied to have it rezoned, and prepared to submit it for approval.
 
 
 8
 In the meantime, franchise consultant Tom Cook, who was responsible for "shopping" and evaluating the restaurants, began to find Hammersmith's restaurants unsatisfactory. On June 24 and 25, 1986, Cook rated the sites "F" on QSC. Four days later, he revoked Hammersmith's operational approval, which also halted processing of his RESAC application. As a result, the successor franchise was never granted, and Unit 168 was forced to close in October 1987. This lawsuit resulted.
 
 TRIAL PROCEEDINGS
 
 9
 In pretrial motions, Taco Bell moved to dismiss Hammersmith's claims of promissory estoppel and breach of oral contract, based on the parol evidence rule. The court agreed and dismissed those claims. Later, Hammersmith moved to file a fifth amended complaint adding a new cause of action based on the March 1986 commitment letter, which the court disallowed. In January 1990, after a four-day trial, the jury returned a combined verdict in favor of GHI on the issues of fraud and tortious bad faith, awarding $1.4 million in compensatory and $1.5 million in punitive damages.
 
 
 10
 Taco Bell then successfully moved for JNOV on both issues. As to fraud, the court held that insufficient evidence had been presented on the elements of Taco Bell's intent to deceive and Hammersmith's right to rely on Nesemeier's representations. As to bad faith, the court held that no special relationship existed as a matter of law. In the alternative, it also reversed the award of punitive damages and conditionally granted a new trial. Finally, the court also found that Taco Bell had not violated the California Franchise Investment Law, and denied reformation and rescission of the agreements. This appeal followed.
 
 STANDARD OF REVIEW
 
 11
 Judgment notwithstanding the verdict is appropriate only where the evidence as a whole, considered in the light most favorable to the non-moving party, can support only one reasonable conclusion. Wilcox v. First Interstate Bank of Oregon, 815 F.2d 522, 525 (9th Cir.1987). If reasonable minds could differ over the verdict, JNOV is improper. Peterson v. Kennedy, 771 F.2d 1244, 1252 (9th Cir.1985). Courts are not free to reweigh evidence or credibility determination. Landes Const. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1372 (9th Cir.1987); Fount-Wip, Inc. v. Reddi-Wip, Inc., 568 F.2d 1296, 1301 (9th Cir.1978). Where conflicting evidence is presented on an issue, "it is the function of the jury, not th[e] court, to resolve the conflict." Walker v. KFC Corp., 728 F.2d 1215, 1223 (9th Cir.1984).
 
 I. FRAUD
 
 12
 Under Oregon law, each element of fraud must be proved by clear and convincing evidence. Webb v. Clark, 274 Or. 387, 391, 546 P.2d 1078, 1080 (1976). Among other elements, the tort requires that the defendant intend to mislead the plaintiff and that the plaintiff have a right to rely on the misrepresentation. Id. Reckless disregard may satisfy the intent requirement. Riley Hill Gen. Contr. v. Tandy Corp., 303 Or. 390, 406, 737 P.2d 595, 605 (1987). Here, the court held that Hammersmith had failed to present substantial evidence of either Taco Bell's intent to deceive or Hammersmith's right to rely on Nesemeier's representations.
 
 A. Intent to Deceive
 
 13
 The court held that any intent to deceive Hammersmith was negated by the numerous documents in which Taco Bell amply disclosed that the criteria for renewal included adequate QSC. Hammersmith contends that the relevant intent was Nesemeier's, not the corporation's, and that Taco Bell is bound by its agent's fraud or recklessness as to truth, citing Barnes v. Eastern & Western Lbr. Co., 205 Or. 553, 588, 287 P.2d 929, 945 (1955) and Criqui v. Pearl Music Co., 41 Or.App. 511, 515, 599 P.2d 1177, 1179 (1979).
 
 
 14
 It is clear that the jury accepted Hammersmith's version of events, and that the court was not free to reweigh that determination. Walker v. KFC, 728 F.2d at 1223. However, as Taco Bell points out, Nesemeier himself sent a letter to Hammersmith only a month after the Hawaii conversation (nine months before he signed the Amendments), which enclosed a "Proposed Franchise Amendment Restructuring Offer" explicitly stating that the conditions for renewal "includ[ed] acceptable QSC."[5] Identical language appeared in a second proposal Taco Bell's president sent to Hammersmith in January 1984.
 
 
 15
 Furthermore, the cases cited by Hammersmith all presume that the agent had actual or apparent authority to make the representations at issue. For example, in Criqui, a "master dealer" was held to be an agent because "the subject matters of [his] representations were of the sort which could reasonably be expected to be made [in] selling a ... dealership." Id., 599 P.2d at 1179. Here, Hammersmith acknowledges that Nesemeier's job was only to explain management policy, not to make policy or negotiate deals. In fact, each of Taco Bell's franchise agreements, as well as the 1985 Amendments themselves, contain the disclaimer that the company may only be bound by a company officer in writing. Therefore, the district court is correct that substantial evidence did not support the jury verdict as to Taco Bell's intent or its vicarious liability for Nesemeier's fraudulent conduct.
 
 2. Right to Rely
 
 16
 Similar problems infect the jury's finding that Hammersmith had a right to rely on Nesemeier's false assurances. At least four of the documents mentioned above referred to renewal criteria, and at least two specified "acceptable QSC" as one of those criteria. Hammersmith argues both that his failure to read the documents was reasonable because he believed that they did not apply to him, and that his reasonableness was an issue for the jury.
 
 
 17
 Oregon law requires that a party investigate representations in certain circumstances before he or she may reasonably rely on the representation. Soursby v. Hawkins, 763 P.2d 725, 729 (Or.1988) (en banc ). Investigation is required whenever both parties have equal access to the needed information, unless discovering the truth is unreasonably difficult. Id. Here, equal access to information clearly existed, since the actual policy was spelled out repeatedly in numerous documents which Hammersmith admitted receiving.[6] Alternatively, discovering the truth would have required only a phone call or letter to Taco Bell headquarters, requesting confirmation, neither of which Hammersmith bothered to do.
 
 
 18
 Whether a party exercised "reasonable diligence" is normally a jury issue, but their behavior may be deemed unreasonable as a matter of law in certain circumstances. Id.; Bradford v. W. Oldsmobile, Inc., 222 Or. 440, 451-52, 353 P.2d 232, 237 (1960); Briskin v. Ernst & Ernst, 589 F.2d 1363, 1367-8 (9th Cir.1978) (distinguishing legal issues from jury questions as to reasonableness). Here, although Hammersmith knew there would be some conditions on the renewal, his entire "investigation" of his supposed unconditional guarantee consisted of one question addressed to Nesemeier in Wilsonville. His failure to recognize that Nesemeier's offer conflicted with stated corporate policy and conduct an investigation to resolve the issue was unreasonable per se.
 
 
 19
 In the alternative, Hammersmith contends that the documents were not necessarily inconsistent, but only ambiguous. It is true that, although the UFOC's and the Successor Franchise Policy each referred to the condition of existing restaurants, the Marketing Proposals themselves did not state that good QSC scores were required for renewal.[7] However, that very ambiguity triggered a duty to investigate. Cohen v. Wedbush, Noble, Cooke Inc., 841 F.2d 282, 287 (9th Cir.1988) (approving "traditional rule" that reliance is unreasonable when oral misrepresentation contradicts explicit contract language).
 
 
 20
 The case of Kabban v. Mackin, 801 P.2d 883 (Or.App.1990), upon which Hammersmith relies, is distinguishable. There, an insurance agent knew that a building was vacant and yet renewed an insurance policy which explicitly excluded vacant buildings. Here, Nesemeier did not have the authority to actually issue a renewal franchise, nor did he request that one be issued or back up his verbal guarantee in writing. Instead, the documents he sent to Hammersmith included the very criteria which he had just supposedly waived. Hammersmith failed to establish his right to rely on Nesemeier's representations by clear and convincing evidence. The JNOV on the fraud claim is affirmed.[8]
 
 II. BAD FAITH TORT/SPECIAL RELATIONSHIP
 
 21
 The court held that the issue of special relationship was a factual one which should go to the jury. However, after the jury returned a verdict of tortious bad faith, the court granted JNOV on this issue as well, holding that no special relationship existed for a "typical" franchisee as a matter of law under either California or Oregon law. We agree.
 
 A. California Law
 
 22
 Our Circuit has twice held that no special relationship exists between franchisor and franchisee in California where the contract at issue was entered into for profit. See Eichman v. Fotomat Corp., 880 F.2d 149, 169 (9th Cir.1989) (applying five-factor test of Wallis v. Superior Ct., 160 Cal.App.3d 1109, 1118, 207 Cal.Rptr. 123 (1984)); Little Oil Co. v. Atlantic Richfield Co., 852 F.2d 441, 446-47 (9th Cir.1988). See also Premier Wine & Spirits v. E. & J. Gallo Winery, 644 F.Supp. 1431 (E.D.Cal.1986). The franchise relationship was clearly a profit-making one. Therefore, the district court was correct that no special relationship existed as a matter of California law.
 
 B. Oregon Law
 
 23
 We also agree with the district court that no such relationship existed as a matter of Oregon law. Although the Oregon Supreme Court has long recognized special relationships, Harper v. Interstate Brewery Co. 168 Or. 26, 120 P.2d 757 (1942), it has been reluctant to extend the doctrine outside the insurance context, and limited it to fiduciary and trust relationships. Farris v. U.S. Fidelity and Guaranty Co., 284 Or. 453, 587 P.2d 1015, 1018-21 (1978) (no special relationship between liability insurer and insured); Santilli v. State Farm Life Ins. Co., 278 Or. 53, 562 P.2d 965, 969 (1977) (discussing but not deciding whether relationship exists between life insurer and beneficiary). See also Seaward Yacht Sales v. Murray Chris-Craft Cruisers, 701 F.Supp. 767, 771 (D.Or.1988) (no special relationship between manufacturer and dealer).
 
 
 24
 Here, the relationship between GHI and Taco Bell bears little resemblance to a traditional fiduciary or trust relationship. Although the parties were mutually dependent to some extent, each was more interested in its own bottom line than in furthering each other's welfare. For example, Hammersmith refused to purchase supplies from Taco Bell's preferred supplier, and Taco Bell was empowered to force franchisees to meet its standards for cleanliness and service. As such, the relationship between the two was more adversarial than fiduciary.
 
 
 25
 The cases Hammersmith relies upon are distinguishable, and none involved a franchise situation. In Amos v. Union Oil of Cal., 663 F.Supp 1027 (D.Or.1987), the parties agreed that the gasoline dealership at issue was similar to a partnership. In Esso Petroleum Canada v. Security Pac. Bank, 710 F.Supp. 275, 282 (D.Or.1989), the bank was found to have only a normal contractual relationship with its customer, not a special relationship. The district court was correct in its grant of JNOV. Because we affirm the JNOV on both issues, we need not address the court's conditional grant of a new trial and alternative ruling on punitive damages.
 
 III. CFIL VIOLATION
 
 26
 Of the three issues which were tried to the court, Hammersmith appeals only the finding that Taco Bell did not violate the California Franchise Investment Law ("CFIL"), Cal.Corp.Code § 31101 et seq. The CFIL requires that franchisors as large as Taco Bell ("exempt franchisors") disclose all information relating to any material modification of an existing franchise, such as the Amendment at issue here. § 31101(c)(2).[9] Section 31202 makes it unlawful to willfully make untrue statements or omissions in such disclosures. Section 31300 provides for damages or rescission unless 1) the plaintiff knew of the omitted facts, or 2) the defendant exercised reasonable care and did not know of the omission, or 3) the defendant would not have known of the omission even by the exercise of reasonable care.
 
 
 27
 The court held that Taco Bell had provided Hammersmith with "ample documentation" regarding the conditions for obtaining a successor franchise. We will not set aside this finding of fact unless clearly erroneous. Fed.R.Civ.P. 52(a); Rozay's Transfer v. Local Freight Drivers, L. 208, 850 F.2d 1321, 1326 (9th Cir.1988).
 
 
 28
 Based on the documentation in the record, as discussed above, see n. 4 supra, we do not find the ruling to be erroneous. Dollar Systems v. Avcar Leasing Systems, 890 F.2d 165, 173 (9th Cir.1989), is inapposite, as there the franchisor willfully failed to inform the purchaser that it had been suspended from doing business in California. Here, Taco Bell did provide Hammersmith with documentation containing all relevant information, and the CFIL document itself stated that "specified conditions" applied to the offer. Thus, whether Hammersmith actually relied on the document is immaterial. Taco Bell fulfilled its duty to fully inform him regarding the terms of the amendment.
 
 IV. PRETRIAL RULINGS
 
 29
 A. Dismissal of Promissory Estoppel and Oral Contract Claims
 
 
 30
 Hammersmith also appeals two pretrial rulings. First, he argues that his promissory estoppel and breach of oral contract claims should have been allowed to proceed to trial instead of being dismissed for failure to state a claim under Fed.R.Civ.P. 12(b)(6). We review such a dismissal de novo, accepting all allegations in the complaint as true and construing them in the light most favorable to Hammersmith. Kelson v. City of Springfield, 767 F.2d 651, 653 (9th Cir.1985).
 
 
 31
 We agree with the district court and magistrate that these claims are barred by the parol evidence rule as inconsistent with the terms of the original franchise agreement. See Or.Rev.Stat. 41.740; Hatley v. Stafford, 588 P.2d 603 (Or.1978) (en banc); Deerfield Commodities v. Nerco, Inc., 696 P.2d 1096 (Or.App.), pet. for review denied 702 P.2d 1111 (1985). By its own terms, the agreement was fully integrated, and the 1984 amendment retained the original expiration term intact. Thus, any oral agreement extending its terms would necessarily be inconsistent.
 
 
 32
 Neither of the two possible exceptions applies here. It seems implausible rather than "natural" that the oral guarantee would not have been included in the contemporaneous written agreement. Cf. Hatley, 588 P.2d at 606; 1 Restatement of Contracts § 240(1)(b). The chief case on which Hammersmith relies, Welborn v. Rogue Community College Dist., 26 Or.App. 857, 554 P.2d 535 (1976), is inapposite, as it involved neither a fully integrated contract nor a written amendment to the contract as we have here. The separate consideration exception is also inapplicable, as Taco Bell's advertising campaign was sufficient consideration for the Amendment.
 
 
 33
 On the promissory estoppel claim, we adopt the reasoning of Kinn v. Coast Catamaran Corp., 582 F.Supp. 682, 687 (D.Wisc.1984), which held that the parol evidence rule precludes reliance on oral representations which contradict a subsequent written franchise contract. Farley v. United Pac. Ins. Co., 525 P.2d 1003 (Or.1974) is distinguishable, since there an agent's interpretation of policy language equitably estopped the insurance company from denying coverage. By contrast, here Hammersmith is attempting to claim promissory estoppel, based not on Nesemeier's interpretation of the written agreement but on an entirely separate "side" deal. We affirm the trial court's ruling.
 
 B. Fifth Amended Complaint
 
 34
 The final issue on appeal is the court's refusal to allow Hammersmith to file a fifth amended complaint reinstating the promissory estoppel and oral contract claims and adding a new claim based on the March 1986 commitment letter. Denial of permission to amend a pleading under Fed.R.Civ.P. 15(a) is reviewed for abuse of discretion. Thomas-Lazear v. FBI, 851 F.2d 1202, 1206 (9th Cir.1988). For the reasons discussed above, the first two claims were properly denied. As for the new contract claim, regardless of whether three months before trial constitutes "the eve of trial," Hammersmith had plenty of opportunity to raise this claim during two years of pretrial motions, and did not show good cause for not raising it earlier. Denial of the motion did not constitute an abuse of discretion.
 
 DISCUSSION
 
 35
 The district court's rulings are AFFIRMED.
 
 
 
 *
 The panel unanimously agrees that this case is appropriate for submission without oral argument as provided by Fed.R.App.P. 34(a) and Ninth Circuit Rule 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 George Hammersmith is the principal owner of GHI, and assigned Unit 168 to the corporation. Because Hammersmith managed all six restaurants and acted as GHI's liason with Taco Bell, we refer to both entities collectively as "Hammersmith."
 
 
 [2]
 The amendments would also reduce the royalties for his other restaurants from 8% to 5 1/2%, but then add a marketing contribution of 4 1/2% to raise the total payments to 10% for each unit
 
 
 [3]
 At trial, Nesemeier stated that he could not recall either conversation and denied having made any promises. Whitelock testified that he could not recall Nesemeier making such a statement, and that any guarantee of unconditional renewal would have been a "total misrepresentation" in violation of Taco Bell policies on successor franchises
 
 
 [4]
 These included two Uniform Franchise Offering Circulars ("UFOC's") as well as letters from Nesemeier, Taco Bell President John Martin, and FRANMAC, the franchisee association
 
 
 [5]
 See n. 4, supra. In addition, each franchise agreement also provided that maintainance of acceptable QSC was required at all times for continued operation
 
 
 [6]
 One proposal appears in the record with a cover note asking "Do you want to throw this away.[?]"
 
 
 [7]
 Compare December 1983 "Offer:"
 "Taco Bell will issue renewal commitment letter 3 years prior to expiration of agreement provided other renewal criteria are met, including acceptable QSC ..."
 with "Summary" in same package:
 participating franchise owners will receive credit towards payment of the franchise successor fee ... up to the full amount of that fee ...
 Within three years prior to the twenty-year expiration date, Taco Bell will send a commitment letter to issue a new franchise agreement ... subject only to specified conditions, which include ... [payment of the successor fee, execution of a new agreement, satisfactory financial performance, installation of a drive-thru window, and other physical improvements.] Special Note:
 The proposed amendments will not require any additional service to be performed by the franchise owner other than the payment of additional funds." (emphasis added.)
 
 
 [8]
 Because we affirm the district court, we need not address Taco Bell's arguments as to statute of limitations, release, or waiver
 
 
 [9]
 The court's opinion erroneously refers to this section as § 31101(d)