**BURGER KING CORPORATION,**
Plaintiff/Counter–Defendant,

v.

James R. AUSTIN, Loretta W. Austin and Austin Food Corp., Defendants/Counter–Plaintiffs.

No. 90–0784–CIV.

United States District Court,
S.D. Florida.

Oct. 9, 1992.

T. Joan Lawrence, Steel Hector & Davis, Miami, Fla., for plaintiff.

Stephen M. Jampol, Rock & Leits, Atlanta, Ga., Stuart H. Sobel, Sobel & Sobel, Miami, Fla., for defendants.

## ORDER

HOEVELER, District Judge.

THIS CAUSE is before the Court on Counter-Defendant Burger King Corporation's ("BKC") Motions: (1) to Dismiss Defendants' ("Austins") First Amended Counterclaim ("Counterclaim"); and (2) to Strike Defendants' Prayer for Damages in the Counterclaim. Also pending is Austins' Appeal from Magistrate Judge Bandstra's Order dated November 30, 1990.

## I. BACKGROUND

Austins were franchisees of two Burger King restaurants. As a result of their non-payment of royalties, advertising and sales promotion expenses, and rents as provided by the Franchise Agreements, BKC terminated the franchise relationships on March 30, 1990. Nevertheless, Defendants continued to operate the restaurants and to use the Burger King trademark. BKC brought this action for damages and injunctive re-

lief for breach of several agreements that Austins had executed in connection with the franchises, under the Lanham Trademark Act, 15 U.S.C. §§ 1114 and 1125(a), and for common law unfair competition and trademark infringement.

Defendants admitted in their Answer that they did not pay the various sums to BKC, but claim that their failure to pay was excused because of the various claims asserted in their counterclaims.

On December 26, 1990, the Court granted BKC's Motion for Preliminary Injunction against Austins' continued use of the BKC trademark. On November 5, 1990, the Court granted BKC's Motion to Dismiss Austins' Counterclaim, however, granted Austins' leave to amend such Counterclaim. Austins filed an Amended Counterclaim, which is the subject of this Order.

## II. MOTION TO DISMISS

### A. *Legal Standard*

█ A court shall not grant a motion to dismiss unless it appears beyond doubt that a claimant can prove no set of facts in support of his claim that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). In examining a motion to dismiss, the material allegations of the claims are taken as true and are liberally construed in favor of the plaintiff. *See, e.g., Burch v. Apalachee Community Mental Health Serv., Inc.,* 840 F.2d 797, 798 (11th Cir. 1988), *aff'd,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Jackam v. Hospital Corp. of Am. Mideast,* 800 F.2d 1577, 1579 (11th Cir.1986) ("[T]he movant sustains a very high burden.") (citations omitted); *St. Joseph's Hosp., Inc. v. Hospital Corp. of Am.,* 795 F.2d 948, 954 (11th Cir.1986); *Quality Foods v. Latin Am. Agribusiness Dev. Corp.,* 711 F.2d 989, 995 (11th Cir. 1983) (Plaintiffs' "threshold of sufficiency ... is exceedingly low.").

**1.** Franchise Agreements # 3754 and # 6470 are identical for purposes of this Order.

**2.** BKC first asserts that Counter-Plaintiffs Austins have failed to allege any facts that would

### B. *Analysis*

**1. Counts I and II: Breach of Express Contract**

█ Counts I and II of the Counterclaim allege "Breach of Express Contract" for Franchise Agreements # 3754 and # 6470,[1] respectively.[2] Both Counts contain eight allegations of BKC's breach by:

(1) substantially damaging the BKC System and substantially damaging the value of the BKC Marks in 1989; and/or,

(2) depriving the Counterclaim Plaintiffs of the unique benefits of the high reputation and positive image of BKC, in 1989; and/or,

(3) destroying the close personal relationship between BKC, on the one hand, and [Austins], on the other hand, and failing to adhere to the principles of the BKC System, in 1989; and/or,

(4) failing to encourage and/or consider suggestions of Franchisees in general, and J. Austin and Austin Food Corp. in particular, for the improvement of the Burger King System, prior to BKC's adoption and/or modification of standards, specifications and procedures for the Burger King System, in 1989; and/or,

(5) discontinuing the periodic advice and consultation with J. Austin and Austin Food Corp., in 1989; and/or

(6) failing to spend the monies contributed by J. Austin and Austin Food Corp. on local advertising, marketing, and promotion for the first seven (7) months of 1989 in the Atlanta ADI; and/or

(7) failing to spend the monies contributed by J. Austin and Austin Food Corp. on direct administrative expenses of advertising, marketing and promotion or on research expenditures directly related to the development and evaluation of the effectiveness of advertising and sales promotion, in 1989; and

put BKC on notice of the acts or conduct that constitute a breach of contract. The Court cannot agree. Rather, the Court finds that Austins have met the notice-pleading requirements of Fed.R.Civ.Pro. 8.

(8) wrongfully terminating Franchise # 3754 [and # 6470] in April, 1990.

The Court finds that Allegations One through Five and Eight can support a claim for breach of express contract. Each of the allegations alleges a breach of a specific clause in the Franchise Agreement. Although some of the clauses that were allegedly breached are in the Introduction to the Agreement, the Agreement specifies that the Introduction is a part of the Agreement. BKC argues that Allegation Five is insufficient because the Franchise Agreement imposes no duty on BKC to encourage, solicit, or implement any Franchisee suggestions. The Court disagrees; Section 4 of the Franchise Agreement states, in relevant part: "Suggestions from franchisees for improving elements of the Burger King System, such as products, equipment, uniforms, restaurant facilities, service format and advertising are encouraged and will be considered by BKC when adopting or modifying standards, specifications and procedures for the Burger King System." This clause requires BKC to encourage and consider franchisee suggestions.[3] If BKC refused to do so, it would be in breach of the Agreement. Accordingly, this allegation can support Austins' claim in Counts I and II.

■ BKC argues that Austins' allegations relating to advertising (Six and Seven) in Counts I and II of their Counterclaim are specifically negated by the express terms of the Franchise Agreement. Section 8(B) of the Franchise Agreement states, in relevant part:

In addition, FRANCHISEE shall pay to BKC an amount equal to 4% of FRANCHISEE's monthly gross sales by the tenth (10th) day of each month based upon FRANCHISEE's gross sales for the preceding month. This sum, less direct administrative expenses, will be used for advertising, sales promotion and public relations both in the market area (A.D.I.) in which the Franchised Restaurant is located and on a national basis.... All such expenditures shall be at the discretion of BKC.

In its Order dated November 5, 1990, the Court dismissed a very similar claim of breach of express contract: "By the unequivocal terms of the contract in this case, BKC was not obligated to spend the advertising monies in any particular way. BKC could choose to spend all on local advertising, all on national advertising, or allocate a portion of the monies to both." The Court finds that this Order continues to be controlling here. The Agreement states that BKC retains discretion over advertising spending; accordingly, BKC could not have breached the *express* terms of the contract by failing to spend monies on local advertising.[4] Allegations Six and Seven are therefore STRICKEN.

2. Count III: Conversion

■ Count III of the Counterclaim for "Conversion of Advertising Monies" alleges that BKC exercised dominion and con-

---

**3.** BKC correctly asserts that it is under no duty to implement franchisee suggestions, however Allegation Five of Counts I and II does not mention BKC's failure to implement franchisee suggestions.

**4.** In *Al Copeland Enter. v. Jamplis*, No. 90–4902, 1991 WL 49651, 1991 U.S. Dist. LEXIS 4258, (E.D.La. April 2, 1991), the court considered similar claims, namely that counterclaim defendants, Al Copeland Enterprises ("ACE"), "failed to comply with its obligation to provide local advertising support." *Id.* at *2. The *Copeland* court dismissed ACE's counterclaims, concluding that "[n]one of defendants' claims can survive [the] express contractual disclaimer of any obligation to provide advertising in any particular local market.... The defendants cannot claim injury as a result of ACE's doing what it had a right to do under the contracts." *Id.* at *3–4. The contractual disclaimer stated:

Selection of media and locale for media placement shall be at the sole discretion of the Administrator of The Fund. Franchisee understands that such advertising is intended to maximize the public's awareness of POPEYE'S Famous Fried Chicken restaurants and that Franchisor accordingly undertakes no obligation to insure that any individual franchisee benefits directly or on a pro rata basis from the placement, if any, of such advertising in his local market.

*Id.* at *3; *see also Gregory v. Popeye's Famous Fried Chicken & Biscuits, Inc.*, No. 87–1461–Civ, 857 F.2d 1474 (Table) 1988 U.S.App. LEXIS 12304 (6th Cir. Sept. 9, 1988) (interpreting the above disclaimer as the *Copeland* court did).

trol over advertising funds paid by Austins and failed to expend said funds on advertising, resulting in an unlawful conversion of said funds.

As a threshold matter, we must first determine which law applies to this tort claim. The Franchise Agreement provides that it "[s]hall be governed and construed under and in accordance with the laws of the State of Florida." However, "[c]laims arising in tort are not ordinarily controlled by a contractual choice of law provision.... Rather, they are decided according to the law of the forum state." *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.,* 971 F.2d 401, 407 (9th Cir. 1992) (citations omitted); *see Ritchie Enter. v. Honeywell Bull, Inc.,* 730 F.Supp. 1041, 1046 (D.Kan.1990). Florida utilizes the "most significant relationship" test to determine which state's law applies to tort claims. *Garcia v. Public Health Trust,* 841 F.2d 1062, 1064–65 (11th Cir.1988). Here, both Florida and Georgia have significant relationships to the parties. The Court, however, does not at this time determine which of the two has the "most" significant relationship because it appears that the law of conversion is similar in both states.

Conversion is defined as:

[A]n act of dominion wrongfully asserted over another's property inconsistent with his ownership therein. In essence, conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time. It is the disseisin of the owner or an interference with legal rights which are incident to ownership, such as the right to possession. Its essential element is a wrongful deprivation of property of the owner.

12 *Fla.Jur.2d Conversion & Replevin* § 1 (1979). "A mere obligation to pay money

may not be enforced by a conversion action.... [A]nd an action in tort is inappropriate where the basis of the suit is a contract, either express or implied." *Belford Trucking Co. v. Zagar,* 243 So.2d 646 (Fla.App.Dist.1970) (citations omitted); *see Advanced Surgical Technologies, Inc. v. Automated Instruments, Inc.,* 777 F.2d 1504, 1507 (11th Cir.1985); *Futch v. Head,* 511 So.2d 314, 320–21 (Fla.App.Dist.1987); *Douglas v. Braman Porsche Audi, Inc.,* 451 So.2d 1038, 1039 (Fla.App.Dist.1984).[5]

Here, Austins' allegations regarding BKC's failure to expend funds it collected from Austins on advertising are based solely on the obligations contained in the Franchise Agreement. Such allegations are properly asserted in a claim for breach of contract (as Austins have asserted in Counts I and II in their claim for breach of express contract and in Counts IV and V in their claim for breach of implied covenant of good faith), rather than in a claim for conversion. Austins allegations simply do not constitute conversion, as defined under either Florida or Georgia law. Accordingly, Count III of the Counterclaim is DISMISSED.

### 3. Counts IV through XI: Implied Obligation of Good Faith and Fair Dealing

Counts IV through XI allege that BKC breached the implied contractual obligation of good faith and fair dealing contained in the Franchise Agreement.

BKC argues that these Counts must be dismissed because the implied covenant of good faith and fair dealing: (1) does not create substantive contractual rights independent from those set forth in the agreement; and (2) cannot be used to vary or contradict the express terms of the written agreement.

---

5. In *LaRoche Indus. v. AIG Risk Management,* 959 F.2d 189 (11th Cir.1992), the Eleventh Circuit Court of Appeals discussed tortious conversion under Georgia law. The court upheld the district court's decision not to permit punitive damages because it was properly brought as a claim for breach of contract: "Georgia's conversion law does not transform every breach of a contractual obligation to pay money into a tort, comprised of withholding funds and exercising dominion over them." *Id.* at 191. The court went on to distinguish cases that involved misappropriation of funds held for a particular purpose that "visit[ed] an independent, noncontractual injury on the plaintiff." *Id.* Based on our review of *LaRoche* and other Georgia case law, we conclude that Georgia's conversion law is similar to Florida's.

In *Scheck v. Burger King Corp.,* 798 F.Supp. 692 (S.D.Fla.1992), this Court discussed the implied covenant of good faith and fair dealing and concluded that "Florida contract law recognizes the implied covenant of good faith and fair dealing." *Id.* at 694 (citations omitted). This implied covenant "imposes upon each party the duty to do nothing destructive of the other party's right to enjoy the fruits of the contract and to do everything that the contract presupposes they will do to accomplish its purpose." *Id.* at 694 n. 5 (quoting *Conoco, Inc. v. Inman Oil Co.,* 774 F.2d 895, 908 (8th Cir.1985)).[6] The Court concluded that "Florida law recognizes an independent cause of action for breach of this implied covenant of good faith." *Id.* at 695.

As in *Scheck,* the Court need not issue a ruling that in any way challenges BKC's assertion that the covenant of good faith cannot be implied in derogation of the express terms of a contract. *See id.* at 696, 697–698.[7] Rather, the question pending here involves the implied covenant of good faith in a contract that grants one party to the contract, BKC, the discretion to make certain material decisions.[8]

One oft-cited case in this area, *Dayan v. McDonald's Corp.,* 125 Ill.App.3d 972, 81 Ill.Dec. 156, 466 N.E.2d 958 (1984) describes the implied covenant of good faith in such a situation:

> [T]he doctrine of good faith performance imposes a limitation on the exercise of discretion vested in one of the parties to a contract.... In describing the nature of that limitation the courts of this State have held that a party vested with contractual discretion must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

*Id.* 81 Ill.Dec. at 170, 466 N.E.2d at 972 (citations omitted); *see also Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1443–45 (7th Cir.1992);

> [A]lthough the implied covenant of good faith and fair dealing does not create 'an enforceable duty to be nice or to behave decently in a general way,' *Zick [v. Verson Allsteel Press Co.],* 623 F.Supp. 927, 929 (N.D.Ill.1985), it does require Baxter to exercise the discretion afforded it by the license agreement in a manner consistent with the reasonable expectations of the parties.

*Carvel Corp. v. Diversified Management Group, Inc.,* 930 F.2d 228, 230–31 (2d Cir. 1991);

> The evidence presented by DMG purportedly showing Carvel's bad faith included Carvel's rejection of proposed store locations and franchisees, refusal to allow changes in store blueprints to accommodate Maryland Health Department requirements, and apparently abrupt and unexplained decision to reverse wholesale sales and advertising policies. While the distributorship agreement gave Carvel considerable discretion with regard to advertising, store location, wholesale sales, and other matters, this did not relieve Carvel of its duty to act in good faith.[9]

> DMG's essential assertion is that Carvel breached the agreement by breaching the duty of good faith and fair dealing, not by each of the specific acts enumerated. These acts were offered more particularly as *evidence* of Carvel's bad faith. Since the contract gave Carvel considerable discretion with regard to matters like advertising campaigns, store locations and wholesale sales, the jury, as instructed, could have mistakenly believed that Carvel was not in breach because it had near absolute control over these matters. However, even if it acted within the bounds of its discretion, Carvel would be in breach if it acted unreasonably.

*Id.* at 232.

---

**6.** For further discussions concerning the role of the implied covenant of good faith, see cases cited in *Scheck,* 798 F.Supp. at 694, n. 5.

**7.** "[T]he implied covenant will rarely be applied to contradict the express provisions of a contract because the express provisions generally evidence the reasonable expectations of the parties." *Deutz–Allis Corp. v. Scott Mach. Co.,* Case. No. 88–1450, 1989 WL 62481, *3, 1989 U.S. Dist. LEXIS 6474, at *6 (D.Or. June 7, 1989).

**8.** Although *Scheck* did not involve the particular situation the Court is facing here, we alluded to such case law therein. *See Scheck,* 798 F.Supp. at 696, n. 9.

**9.** The *Carvel* court continued:

*Hubbard Chevrolet Co. v. General Motors Corp.,* 873 F.2d 873 (5th Cir.), *cert. denied,* 493 U.S. 978, 110 S.Ct. 506, 107 L.Ed.2d 508 (1989);

> [T]he implied covenant seeks to protect the contracting parties' reasonable expectations ... [and] serves to supply limits on the parties' conduct when their contract defers decision on a particular term, omits terms or provides ambiguous terms ... Michigan courts rely on the implied covenant of good faith "[w]here a party to a contract makes the manner of its performance a matter of its own discretion."

(quoting *Burkhardt v. City Nat'l Bank,* 57 Mich.App. 649, 226 N.W.2d 678, 680 (1975));[10] *Bonfield v. AAMCO Transmissions, Inc.,* 708 F.Supp. 867, 885 (N.D.Ill. 1989) (Franchise agreement permitted AAMCO to change its policies applicable to franchisees. However, "when AAMCO decided to change its policies its implied duty of good faith compelled it to do so 'reasonably and with proper motive.' ... So even if the express terms of the Agreement permitted AAMCO to alter its policies, it could not change them arbitrarily."); *BA Mortgage & Int'l Realty Corp. v. American Nat'l Bank & Trust Co.,* 706 F.Supp. 1364, 1373 (N.D.Ill.1989) ("[U]nfettered discretion [in an Agreement that gave the Lender sole discretion in a number of provisions] is precisely what the implied covenant of good faith was designed to deal with."); *Centronics Corp. v. Genicom Corp.,* 132 N.H. 133, 562 A.2d 187, 193 (1989);

> [U]nder an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting.

■ Florida courts have not directly ruled on the role of the implied covenant of

good faith in a contract that vests one party with discretion to act. As we noted in *Scheck,* Florida recognizes the implied covenant of good faith. *Scheck,* 798 F.Supp. at 695. In *Fernandez v. Vazquez,* 397 So.2d 1171, 1174 (Fla.Dist.Ct.App.1981), the Florida Third District Court of Appeal held that

> a lessor may not arbitrarily refuse consent to an assignment of a commercial lease, which provides, even without limiting language, that a lessee shall not assign or sublease the premises without the written consent of the lessor. A withholding of consent to assign a lease, which fails the tests for good faith and commercial reasonableness, constitutes a breach of the lease agreement.

While the *Fernandez* court's holding was in part based on the policy of free alienation of property, it was also based on principles of contract law:

> Underlying the cases abolishing the arbitrary and capricious rule is the now well-accepted concept that a lease is a contract and, as such, should be governed by the general contract principles of good faith and commercial reasonableness. One established contract principle is that a party's good faith cooperation is an implied condition precedent to performance of a contract.

*Id.* at 1173–74. Based on *Fernandez* and our review of other Florida cases that hold similarly, we conclude that Florida would conclude as the courts cited above have, namely that "a party vested with contractual discretion must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Dayan,* 81 Ill.Dec. at 170, 466 N.E.2d at 972.

We now review each of the specific Counts alleging a breach of the implied covenant of good faith (Counts IV through XI) to determine whether they state a

---

10. The *Hubbard* court went on: "Michigan law does not imply the good faith covenant where parties have 'unmistakably expressed' their re- spective rights." *Id.* at 877 (quoting *Bushwick–Decatur Motors v. Ford Motor Co.,* 116 F.2d 675, 677 (2d Cir.1940)).

cause of action based on the above-stated principle.

■ Counts IV and V allege that BKC breached its implied contractual obligation of good faith and fair dealing by abusing its discretion with respect to marketing and promotion and defeating Austins' reasonable expectations. Section 8(B) of the Franchise Agreement vests all discretion with respect to marketing and promotion decisions in BKC: "All [advertising, sales promotion and public relations] expenditures shall be at the discretion of BKC." [11] The implied covenant of good faith requires BKC to exercise this discretion reasonably in a manner consistent with the parties' reasonable expectations. Therefore, Counts IV and V clearly state a cause of action.

■ Counts VI and VII allege that BKC breached the implied covenant of good faith: (1) "to maintain the integrity of the Burger King System;" and (2) to not terminate the franchise wrongfully.[12] Regarding the first allegation, Austins argue:

Defendants plainly bargained for the right to use the Burger King System and Marks.... Implicit within those agreements is a good faith effort by the Plaintiff to maintain the integrity of the Burger King System and Marks. If there is no such obligation imposed on the Plaintiff by the agreement, then the Defendants would continue to be obligated to pay rent, royalties and advertising expenses to the Plaintiff without receiving any benefits of their bargain.

Austins' claim in Counts VI and VII appears very similar to their claim for breach of express contract in Counts I and II (Allegations One Through Three). The allegations in Counts VI and VII do not allege an abuse of discretion on the part of BKC. Rather, they are part and parcel of Austins' claim that BKC deprived them of the benefits expressly granted to them by the Franchise Agreements. Accordingly, Austins' claim that BKC failed to "maintain the integrity of the Burger King System," while sufficiently stating a cause of action for breach of express contract,[13] and arguably presenting a claim for breach of an implied covenant of good faith, is more properly presented in Defendant–Counterclaimants' claims for breach of express contract.

■ Similarly, the second allegation of Counts VI and VII states that BKC had an implied obligation "to not wrongfully terminate" the Franchises. Section 16 of the Franchise Agreement addresses "Default and Effect of Termination" in explicit terms. Any breach of such Clause by BKC would be an express breach of contract,[14]

11. Section 8(B) is quoted more fully in the discussion of Counts I & II, *supra*.

12. Counts VI through XI include language describing BKC's obligation to act in good faith as follows: "Based upon the longstanding customs, policies and practices of BKC, and from the express language of [the] Franchise Agreement[s], BKC had an implied obligation to act in good faith and with fair dealing toward [Austins] ..." BKC argues that "long-standing customs, policies and practices" do not play a role in establishing BKC's implied obligation to act in good faith. The Court agrees. While "customs, policies, and practices" may assist the finder of fact in judging what the parties' reasonable expectations were at the time they entered into the agreement, these factors themselves do not give rise to the implied covenant of good faith and fair dealing. *See, e.g., Pride v. Exxon Corp.*, 911 F.2d 251, 256–57 (9th Cir.1990) distinguishing a situation involving a change in circumstances instigated by a franchiser after the franchise agreement had been signed (in which the court found that a violation of implied contractual obligations was properly alleged) from another circumstance in which a franchiser simply did not alter a preexisting condition about which the franchisees had knowledge (and therefore, finding no bad faith on a motion for summary judgment).

13. See discussion of Counts I and II, *supra*.

14. The second allegation of Counts VI and VII is distinguishable from cases that discuss the role of the implied covenant of good faith in franchise agreements that state that a franchiser can terminate a franchise agreement by providing the requisite notice to the franchisee:

These cases reflect judicial concern over longstanding abuses in franchise relationships, particularly contract provisions giving the franchisor broad unilateral powers of termination at will. Taken collectively, they stand for the proposition that the implied covenant of good faith restricts franchisor discretion in terminating a franchise agreement to those cases where good cause exists.

*Dayan,* 81 Ill.Dec. at 171, 466 N.E.2d at 973.

as was alleged in Counts I and II of the Amended Counterclaim, rather than a breach of BKC's implied obligations.

Because Counts VI and VII are more properly set in a claim for breach of *express* contractual obligations, they are hereby DISMISSED.

██ Counts VIII and IX allege that BKC breached the implied covenant of good faith "to provide down store support" to Austins. Austins argue that these Counts:

> rely upon the language of the Franchise Agreements, which specifically provides, among other things, that a "close personal relationship" is the "essence" of the Franchise Agreement; and that BKC agreed to "advise and consult" with the Defendants.... Again based upon the reasonable expectations of these Defendants, given their prior history of employment as Burger King employees, it would not be unreasonable for them to expect downstore support to be provided to them when their stores were in financial trouble and when all parties were aware that such support was provided in the past under a longstanding custom and practice.

Section Five of the Franchise Agreement, entitled "Services Available to Franchisee," states, in relevant part: "BKC agrees to periodically advise and consult

with FRANCHISEE in connection with the operation of the Franchised Restaurant." Allegation Five of Counts I and II (Breach of Express Contract) states that Burger King discontinued its periodic advice and consultation with Austins in 1989. As in Counts VI and VII, Austins' claim here does not allege an abuse of discretion on the part of BKC, but rather involves an express breach of the benefits accorded to Austins by the Franchise Agreement.[15] Because Counts VIII and IX are more properly set in a claim for breach of express contractual obligations, they are hereby DISMISSED.[16]

██ Counts X and XI allege that BKC breached the implied covenant of good faith by requiring a capital investment in new equipment for the Restaurants. The Franchise Agreement provides at Section 4(D), in relevant part:

> Only equipment approved by BKC which meets the criteria and performance standards of the Burger King Restaurant System may be used in the Franchised Restaurant.... If BKC determines that additional or replacement equipment is needed because of a change in menu items or because of health or safety considerations, FRANCHISEE will install the additional equipment or replacement equipment within the reasonable time specified by BKC.

---

In the case at bar, the Franchise Agreement specifies certain events that permit BKC to terminate the Agreement. Clearly, some of the clauses that permit BKC to terminate the Agreement involve some measure of discretion by BKC. Austins, however, have failed to plead that the "wrongful termination" they are alleging involves BKC's wrongful exercise of discretion contained within the termination clause of the Franchise Agreement. Accordingly, the Court cannot find from these assertions that the implied covenant of good faith was allegedly breached in BKC's termination decision.

15. In order to define the term "advise and consult," the Court may eventually have to apply a standard of reasonableness that encompasses all relevant circumstances surrounding the transaction, "together with any prior negotiations between them and any applicable course of dealing, course of performance or usage." 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.10 (1990).

16. Section 4(A) of the Franchise Agreement discusses the importance of a franchisee's adherence to "BKC's comprehensive restaurant format and operating system" contained in the Manual of Operating Data (M.O.D. Manual). Such provision provides that BKC can change the M.O.D. Manual if it believes "in the good faith exercise of its judgment [that such changes are] desirable and reasonably necessary." Finally, Section 4(A) concludes: "The MOD Manual and other specifications, standards and operating procedures communicated in writing to FRANCHISEE shall be deemed a part of this Agreement." If BKC had been required to provide downstore support in the MOD Manual or in a *written* communication and then changed its operating procedures, this may have given rise to a claim for a breach of the implied covenant of good faith. *See Bonfield,* 708 F.Supp. at 884–85. Austins, however, have not made such an allegation.

This clause vests BKC with complete discretion over the equipment employed within franchisee restaurants. Because such determinations are subject to the implied covenant of good faith and fair dealing, Counts X and XI properly state a cause of action.

4. Count XII: Promissory Estoppel

Count XII asserts a claim of promissory estoppel for the "Undeveloped Rock Site." Austin claims: that in 1987 he was looking for a site to develop a second BKC franchise; that BKC presented him with a site to develop ("Undeveloped Rock Site"); that he placed a $5,000 deposit on the property and began development of the site; that after some time, he discovered that the site was uneconomical for development due to the rock that permeated the site; that BKC had known of the rock problem on the site, yet failed to disclose it to Austin; that Austins reasonably relied on BKC's representations regarding the viability of the site; and that BKC admitted its liability regarding the above, yet failed to fully reimburse Austins for their damages.

BKC argues that when Austin applied for a second franchise on December 6, 1988, he executed a general release from all claims existing prior to the date of the application. BKC offers the Franchise Application as an Exhibit to its Motion to Dismiss.

"[M]atters outside the pleadings cannot be considered on a motion to dismiss under Rule 12(b)(6)." *St. Joseph's Hosp., Inc. v. Hospital Auth. of Am.*, 620 F.Supp. 814, 820 (S.D.Ga.1985) (citations omitted); *see Concordia v. Bendekovic*, 693 F.2d 1073, 1075 (11th Cir.1982) (" 'Matters outside the pleading' ... includ[es] any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for the pleadings.") (citations omitted). Accordingly, this issue is one that may properly be the subject of a motion for summary judgment pursuant to Fed.R.Civ. Pro. 56, *Concordia*, 693 F.2d at 1073; *St. Joseph's Hospital*, 620 F.Supp. at 1075, rather than a motion to dismiss.

In the interest of judicial economy, the Court will preliminarily review the issue presented regarding whether the general release appears to meet BKC's burden on a converted motion for summary judgment.

The document submitted by BKC as Exhibit C to its Motion to Dismiss is entitled "Multiple Franchise Application and General Release" ("Release") and is dated December 6, 1988. The first page of the Release states that Applicant Austin "is applying to BKC for a franchise ... to be located in Smyrna in consideration of the acceptance for processing of this application by BKC." The Release continues:

> ... [Applicant] in making this application and BKC in granting any franchise approval pursuant to this application each represent to the other that neither party is aware of any basis for complaint which it may have which could give rise to a legal claim or action against the other. [Austin then indicated that he was not reserving any claims against BKC.]

. . . . .

> EXCEPT FOR THOSE CLAIMS RESERVED BY EITHER OF THE PARTIES, APPLICANT IN MAKING THIS APPLICATION, AND BKC IN GRANTING ANY FRANCHISE APPROVAL PURSUANT TO THIS APPLICATION, EACH WAIVES, RELEASES AND DISCHARGES THE OTHER ... FROM ANY CLAIM OR ACTION WHATSOEVER EXISTING PRIOR TO THE EFFECTIVE DATE OF THIS AGREEMENT. Both parties understand and agree that this waiver and release does not apply to claims or complaints which may arise on or after the effective date of this Agreement, nor shall it apply to existing accounts payable owed by Applicant to BKC....

Assuming that Austin was aware of the Undeveloped Rock Site claim and did not so indicate on the General Release, the Release appears adequate to foreclose Austins' claim in Count XII. It appears from reading Count XII that the Release was executed after the events described. Austins argue that their Undeveloped Rock Site claim does not fall within the express language of the Release that states "Ex-

cept for those claims reserved by either of the parties." They indicate that they had made a claim for reimbursement for their costs that had not yet been fully paid at the time the Release was executed and therefore, "certainly reserved their claim." The Court cannot agree with this argument at this time. In the Release, the phrase "Except for those claims reserved by either of the parties" appears immediately following the section of the Release entitled "Applicant's Claims Statement." That section states: "Applicant hereby reserves the following claims: __X__ NONE." The portion of that section that follows, entitled "AS SPECIFIED BELOW," is blank.

The Court does not dismiss this Count at this time. Austins may submit affidavits or other exhibits to withstand BKC's converted Motion for Summary Judgment on this Count, if they are able. Austins may also submit an additional memorandum of law, if they so desire. BKC may reply to said memorandum. In addition, BKC may submit any other relevant evidence for the Court to consider on this question. Austins' memorandum of law and any evidence attached thereto should be submitted within thirty days of the date of this Order. BKC should respond within twenty days. Failure to submit such a memorandum and evidence will result in dismissal of Count XII.

### 5. Count XIII: BREACH OF EXPRESS CONTRACT [NDTL]

Count XIII alleges breach of the BKC NDTL Assistance Letter and Sales Estimate ("the Agreement" or "NDTL Agreement"), which Austin executed so that BKC would assist him with the development of a second restaurant site. Austin alleges that BKC materially breached the Agreement: "(1) by failing to provide [Austins] with the input and expertise of the BKC Development Department; and/or, (2) by failing to develop a market plan for the target area; and/or, (3) by failing to identify the site in accordance with BKC criteria."

BKC's Motion to Dismiss refers to that portion of the NDTL Agreement that

states that "[BKC's] assistance to [Austins] does not constitute a representation or guarantee that a particular location will be a successful restaurant location." In addition, BKC cites this Court's Order dated November 5, 1990, which read:

Despite Defendants' attempt to charge BKC with the responsibility for selecting what would prove to be a marketable site, this Court finds that the terms of the Real Estate Assistance Agreement do not make BKC an absolute guarantor of a site's success. In fact, the agreement specifically absolves BKC from liability by stating: "[franchisee] hereby waive[s] and release[s] any right or claim against BKC ... including ... any matter related to the selection or locating of a site ... as well as the particular approved Site not meeting [franchisee's] expectations." NDTL Assistance Letter at 5. As Defendants have failed to point to any other agreement on which to base BKC's liability, Count III is dismissed.

BKC argues that Austins' repleaded Counterclaim cannot be salvaged given the waiver cited above from the NDTL Agreement.

Austins counter that their claims in this Count are different from the allegations previously dismissed by the Court, because the allegations as currently stated track the language of the NDTL Agreement. In addition, Austins argue: "If the language of release contained in the NDTL contract releases the Plaintiff from performing any of its obligations under the NDTL contract, then the entire agreement would have no meaning."

The Court agrees. While the release in the NDTL Agreement serves to preclude any assertion that BKC failed to assist in the selection of a "successful" restaurant location, it does not protect BKC from a claim of breach of contract that involves BKC's failure to perform what is required of it under the Agreement. If the release is read as BKC suggests, BKC would be completely insulated from liability under the contract, and therefore, there would be a lack of mutuality of obligation in the contract. BKC has not suggested that the "agreement" in question is not, in fact, a

valid contract. Accordingly, the Release fails to insulate BKC from liability from breaching the Agreement.[17]

### 6. Count XIV: Intentional Fraud— #6470

In Count XIV, Austins allege that BKC "knowingly and intentionally" concealed certain material facts from them; that Austins "reasonably relied on [BKC's] recommendation, advice and supposedly superior knowledge and expertise" regarding "the suitability of the South Cobb Drive Site;" and, that Austins proximately suffered damages as a result of such fraud.

■ BKC first argues in its Motion to Dismiss that the terms of the express release in the NDTL Agreement shield it from liability. As we stated in *Scheck*, "a general release cannot be held to bar a claim which did not exist when it was signed." *Scheck*, 756 F.Supp. at 547 (citations omitted). At the time the NDTL Agreement was signed, Austins did not have a claim of fraud against BKC. This claim will not be dismissed because of the release.

■ BKC then argues that Austins' fraud claim is facially insufficient because BKC and Austins were not in a fiduciary relationship.

As we discussed when reviewing Austins' action for conversion, a choice of law clause in a contract is inapplicable to a tort claim like fraud. *See* discussion of Count III, *supra; see also, Ryder Truck Lines, Inc. v. Goren Equip. Co.*, 576 F.Supp. 1348, 1354 (N.D.Ga.1983) ("The issues of fraud and duress, however relate to the validity of the contract as a result of alleged pre-contract misrepresentations, and

are matters outside the contract."). Again, the Court is not obligated to determine whether Florida or Georgia has the most significant relationship to the parties at this time, as it appears that the law of fraudulent concealment is similar in both states.

In Florida:

> Florida law additionally charges a claimant with knowledge of all facts that he could have learned through diligent inquiry.... In absence of a fiduciary relationship, mere nondisclosure of material facts in an arm's length transaction is ordinarily not actionable misrepresentation unless some artifice or trick has been employed to prevent the representee from making further independent inquiry, though non-disclosure of material facts may be fraudulent where the other party does not have an equal opportunity to become appraised of the facts.

*Taylor v. American Honda Motor Co.*, 555 F.Supp. 59, 64 (M.D.Fla.1982) (citations omitted).[18]

Austins have not alleged that BKC employed any "artifice or trick" to prevent them from making an independent factual inquiry, nor have they indicated that they did not have an "equal opportunity to become apprised of the facts" surrounding the transaction. Rather, they are arguing that their relationship with BKC required BKC to make certain material disclosures that it would otherwise not have been obligated to make.

In its Order dated November 5, 1990, the Court held that no fiduciary relationship existed between BKC and Austins: "The majority of courts which have considered a

---

**17.** In *Scheck v. Burger King Corp.*, 756 F.Supp. 543, 547 n. 5 (S.D.Fla.1991), the Court faced a similar argument and found "[n]o special circumstances ... which would support the wisdom of enforcing an agreement to render an ongoing contract unenforceable."

**18.** In *Southern Intermodal Logistics, Inc. v. Smith & Kelly Co.*, 190 Ga.App. 584, 379 S.E.2d 612 (1989), the court discussed fraudulent concealment claims under Georgia law.

> "Suppression of a material fact which a party is under an obligation to communicate consti-

tutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." OCGA @23–2–53. While concealment of material facts may amount to fraud when the concealment is of intrinsic qualities the other party could not discover by the exercise of ordinary care ... in an arms-length business or contractual relationship there is no obligation to disclose information which is equally available to both parties. *Id.* 379 S.E.2d at 613–14 (citations omitted).

similar issue have held that a franchisee and a franchiser stand at arms-length and do not have a fiduciary relationship; this Court follows these well-reasoned opinions." Austins argue that they were already involved in a contractual relationship with BKC (via their other franchise location) and that under the agreement, BKC agreed that a "close personal relationship" between the parties was required. In essence, Austins are arguing that by virtue of their ongoing relationship with BKC, their relationship in the NDTL Agreement was not arms-length. The Court cannot agree. Although the Franchise Agreement contains language referring to the parties' "close personal relationship," it also contains explicit language stating that there is no fiduciary relationship between the parties. As the Court outlined in its November 5, 1990 Order:

> Further support for the proposition that the parties stood at arms-length is the fact that the franchise agreements themselves expressly state: "FRANCHISEE is an independent contractor and is not an agent, partner, joint venturer, or employee of BKC, and no fiduciary relationship between the parties exists." Franchise Agreements # 3754 and # 6470, para. 10(B).

In addition, the NDTL Agreement itself contains a proviso already cited by the Court, "BKC's assistance to [Austins] does not constitute a representation or guarantee that a particular location will be a successful restaurant location," and the Agreement states that "BKC recommend[s] that I not sign any contract without first seeking independent expert legal advice." These clauses give further credence to the Court's belief that the parties were acting at arms-length.

Austins argue that their relationship with BKC, if not a fiduciary relationship, was a confidential or special relationship. The Court has reviewed several decisions that considered whether franchisers and franchisees stand in a special or confidential relationship. The great majority of courts have determined that a franchiser and franchisee do not enjoy such a relationship. *See George Hammersmith, Inc. v. Taco Bell Corp.,* 942 F.2d 791 (Table), 1991 WL 159466, at *4–5, 1991 U.S.App. LEXIS 19716, at *13–16 (9th Cir. July 12, 1991) (finding no special relationship as a matter of either California or Oregon law, in part based on the for-profit nature of the relationship between franchiser and franchisee.); *O'Neal v. Burger Chef Sys., Inc.,* 860 F.2d 1341, 1349–52 (6th Cir.1988); *Vaughn v. General Foods Corp.,* 797 F.2d 1403, 1413–14 (7th Cir.1986), *cert. denied,* 479 U.S. 1087, 107 S.Ct. 1293, 94 L.Ed.2d 149 (1987); *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 595 (Tex.1992) ("Every contract includes an element of confidence and trust that each party will faithfully perform his obligation under the contract. Neither is the fact that the relationship has been a cordial one, of long duration, evidence of a confidential relationship.") (footnote omitted) (citation omitted). *But see, Williams v. Dresser Indus., Inc.,* 795 F.Supp. 1144 (N.D.Ga.1992); *West Coast Video Enter., Inc. v. Ponce de Leon,* No. 90 C 1236, 1991 WL 49566, at *6–8, 1991 U.S. Dist. LEXIS 4209, at *18–21 (N.D.Ill. April 3, 1991) (finding a "special" relationship based on the Illinois Franchise Disclosure Act); *Mister Donut of Am., Inc. v. Harris,* 150 Ariz. 321, 723 P.2d 670, 673 (1986).

In addition, the Court has reviewed both Florida and Georgia law regarding confidential or special relationships. The Court found no case in which a Florida court held that a franchisee and franchiser are in a confidential or special relationship. While the Florida Supreme Court recently stated, "The law appears to be working toward the ultimate conclusion that full disclosure of all material facts must be made whenever elementary fair conduct demands it," *Johnson v. Davis,* 480 So.2d 625 (Fla.1985), Florida courts have generally limited the finding of a "confidential" or "special" relationship to the area of real property sales. *Id.* (disclosure of latent defects to buyers of real estate required).[19]

---

**19.** Austins cite *Mayer v. Cianciolo,* 463 So.2d 1219 (Fla.Dist.Ct.App.1985), in which the court stated:

The United States District Court for the Northern District of Georgia recently considered the question of whether a franchiser and franchisee stand in a "confidential" or "special" relationship under Georgia law. *Williams*, 795 F.Supp. at 1147–51. In *Williams*, a franchiser failed to disclose its plans to form a joint venture with a competitor of the franchisee-plaintiff. *Id.* at 1146–47. The court stated: "Georgia courts have consistently found a duty of disclosure to arise from a number of situations not involving strict fiduciary or confidential relationships," *id.* at 1148 (citations omitted), and continued, "[A] confidential relationship ... may nevertheless arise from the circumstances of the parties' dealings, to be determined on a case by case basis." *Id.* at 1149. The court concluded that the parties were in a confidential relationship based on: (1) the alleged misrepresentation occurred when the parties were at the negotiation stage of their relationship as franchiser-franchisee, rather than during an ongoing relationship (*id.* at 1148); (2) Georgia law may impose a confidential relationship based on the facts of the case, even though there is not a strict fiduciary relationship (*id.* at 1149–50); (3) the specific facts of the case were particularly egregious (involving Plaintiffs' decision to purchase a company, Tri–State, in part because Defendant-franchiser reassured Plaintiffs that the parties' franchise

relationship would continue basically unchanged after Plaintiffs purchase of Tri–State; and then, three days after Plaintiffs executed a new franchise agreement with Defendant (and simultaneously purchased Tri–State), Defendant publicly announced the major joint venture agreement with Plaintiffs' competitor) (*id.* at 1150).

Here, in examining the circumstances of the parties' dealings as alleged, the Court finds that under either Florida or Georgia law (and based, in part, on its review of the law of other jurisdictions), no special or confidential relationship exists between Austins and BKC with respect to the NDTL Agreement.[20] Although the Franchise Agreement states that the parties will have a "close personal relationship," the Agreement specifically states that the parties are not in a fiduciary relationship.[21] Further, the NDTL Agreement itself does not give rise to the finding of a "special" or "confidential" relationship, as it contains certain clauses that warn a prospective franchisee that the parties are operating at arms-length. Accordingly, Count XIV is hereby DISMISSED.

### 7. Count XV: Breach of Florida Franchise Act

In Count XV, Plaintiffs allege that BKC breached the Florida Franchise Act (Fla. Stat. § 817.416) by intentionally misrepre-

"Confidential relations," as a legal concept, is not confined to the strict fiduciary relationship existing between those having definite, well-recognized legal relations of trust and confidence, but extends to every possible case in which a fiduciary relation exists as a fact, though it may be a moral, social, domestic, or merely personal relationship.
*Id.* at 1222 n. 1 (citations omitted). *Mayer* is distinguishable in that it involved imposition of a constructive trust on certain real property. In addition, the Court finds that the case at bar does not involve a fiduciary relationship as a matter of fact.

**20.** Although the *Williams* court found that the parties were in a confidential relationship under Georgia law, this Court is unmoved that the parties in the case at bar would be found to stand in such a relationship under Georgia law. *Williams* involved particularly egregious facts, and the Court finds that the facts alleged here do not rise to the *Williams* level. In addition,

the Franchise Agreement and NDTL Agreement put a franchisee on notice that the parties are dealing at arms length.

**21.** In *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591 (Tex.1992), the Supreme Court of Texas rejected a similar argument that language in a contract that "articulates a special trust and confidence between these parties beyond that ordinarily found in a contract" demonstrated a fiduciary or confidential relationship. *Id.* at 595. The Texas Supreme Court went on to find that

[t]he Crims' reliance on the cited contract language as evidence of a confidential relationship is misplaced. Such 'boiler plate' language is designed to give the parties some degree of control over with whom they do business, and nothing more. This language was obviously intended to render the franchise agreement unilaterally unassignable.
*Id.* at 596.

senting material facts regarding Franchise # 6470 that were intended to induce Austins to enter into Franchise Agreement # 6470, and which Austins relied on in entering into such Agreements.

BKC counters that Austins do not have standing under the Florida Franchise Act (§ 817.416(1)(a)) because it applies only to "persons" that are "doing business in Florida." Austins counter that the choice of law provision in the Franchise Offering Memorandum and Franchise Agreement explicitly states that Florida law will govern the parties' relationship.[22]

The Court was unable to find any case interpreting this Florida statute as BKC has suggested. BKC cites a number of cases from other jurisdictions that have limited the extraterritorial application of state franchise acts to in-state franchisees. *See Highway Equip. Co. v. Caterpillar Inc.,* 908 F.2d 60 (6th Cir.1990) (Illinois Franchise Disclosure Act); *Hoff Supply Co. v. Allen-Bradley Co.,* 750 F.Supp. 176 (M.D.Pa.1990) (Wisconsin Fair Dealership Law); *Power Draulics-Nielsen, Inc. v. Libbey Owens-Ford Co.,* Bus. Franchise Guide (CCH) ¶ 9075 (S.D.N.Y. Apr. 27, 1987) (Connecticut Franchise Act); *see also Premier Wine & Spirits v. E. & J. Gallo Winery,* 644 F.Supp. 1431, 1439 (E.D.Cal. 1986) (California Franchise Relations Act), *aff'd,* 846 F.2d 537, 540 (9th Cir.1988). In the only case cited by BKC in which the franchise agreement contained a choice of law provision, *Highway Equip. Co.* (stating that Illinois law would apply), the Sixth Circuit refused to apply the Illinois Act to an Ohio franchisee. *Highway Equip. Co.,* 908 F.2d at 63. The court concluded that the Illinois legislature did not intend for

the Illinois Franchise Disclosure Act to apply extraterritorially, *id.* at 64, basing its conclusion in part on the legislature's reenactment of the Illinois Franchise Disclosure Act in 1987. When it reenacted the Act, the Illinois legislature "confirmed that the statute is intended to protect Illinois residents only." *Id.* at 63 (citing Ill.Rev.Stat. ch. 121½, ¶ 1702).[23]

The Florida Franchise Act does not reveal a similar, clear intention by the Florida legislature to limit its application to Florida residents or domiciliaries. The Act defines "person" as "an individual, partnership, corporation, association, or other entity doing business in Florida." Fla.Stat. § 817.-416(1)(a). It then defines "franchise or distributorship" as "a contract or agreement ... between two or more *persons.*" *Id.* at § 817.416(1)(b) (emphasis added). The Act goes on to declare it "unlawful, when selling or establishing a franchise or distributorship, for any *person*" to make certain intentional misrepresentations, *id.* at § 817.416(2) (emphasis added), and provides that "[a]ny *person,* who shows in a civil court of law a violation of this section may receive a judgment for all moneys invested in such franchise or distributorship." *Id.* at § 817.416(3) (emphasis added). Substituting the definition of "person" into the other relevant portions of the Florida Franchise Act, demonstrates that the Act is only applicable to franchisees and franchisers "doing business in Florida."

Here, the Court finds that by including a choice of law provision in its Franchise Agreement that provides for Florida law to govern the Agreement, BKC is subject to the dictates of the Florida Franchise Act. Such intent to have the

---

22. The Choice of Law provision in the Franchise Agreement reads: "The parties agree that [the Agreement] shall be deemed made and entered into it in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida."

23. Similarly, the Connecticut Franchise Act interpreted in *Power Draulics-Nielsen, Inc.* "was amended in 1985 to make clear the intent that the law would apply only to Connecticut franchisees and not to franchisees in other states holding franchises granted by Connecticut franchisors." *Power Draulics-Nielsen, Inc.,* Bus.

Franchise Guide at 18,716. The Wisconsin Fair Dealership Law discussed in *Hoff Supply Co.,* defines "Dealer" as a "person who is a grantee of a dealership situated in this state." *Hoff Supply Co.,* 750 F.Supp. at 177 (quoting Wis. Stat. § 135.02(2)). The California Franchise Relations Act states that it applies "to any franchise where either the franchise is domiciled in this state or the franchised business is or has been operating in this state." *Premier Wine & Spirits,* 644 F.Supp. at 1439 (quoting Cal.Bus. & Prof.Code. § 20015).

Agreement be subject to the laws of the State of Florida demonstrates that both BKC and Austins intended that they be regarded as doing business in Florida.[24] Any other decision would be unjust; this Court and other courts have determined that the choice of law provision in the BKC franchise agreement renders the franchisee's home state franchise act inapplicable to a dispute between BKC and the franchisee. *See Scheck v. Burger King Corp.,* 756 F.Supp. 543, 550 (S.D.Fla.1991) (Massachusetts Consumer Protection Act was inapplicable to franchisee's claims because the parties included a choice of law clause that indicated that Florida law governed the contract); *see also Burger King Corp. v. Weaver,* 798 F.Supp. 684, 690 (S.D.Fla. 1992) (Montana Unfair Trade Practices Act "is inapplicable to a lawsuit construed in accordance with the laws of the State of Florida."). If we were now to state that the Florida Franchise Act is inapplicable to a dispute between a Florida franchiser and a non-Florida resident franchisee, non-Florida resident franchisees would be afforded no protection beyond common law remedies, regardless of whether or not their home state or Florida provided such protection.[25] BKC would then be obtaining an unfair advantage solely by virtue of a choice of law provision that benefits BKC by ensuring uniform enforcement of its franchise agreements. *See Carlock v. Pillsbury Co.,* 719 F.Supp. 791, 808 (D.Minn.1989) ("[A]pplication of different bodies of law to various contracts would likely render the franchise system unmanageable."). The Court's conclusion is consistent with *Department of Motor Vehicles v. Mercedes–Benz of North Am., Inc.,* 408 So.2d 627 (Fla.Dist.Ct.App.1981), in which the Florida Second District Court of Appeal held that a New Jersey law that regulated the transfer of automobile franchises was applicable to an agreement entered into by a Florida franchisee, Fifth Avenue Motors, and a franchiser, Mercedes Benz, which was incorporated in Delaware and headquartered in New Jersey. *Id.* at 629. The parties' agreement in *Department of Motor Vehicles* stated that it was governed by the laws of the state of New Jersey. *Id.* Mercedes Benz argued, among other reasons, that "New Jersey law is limited to New Jersey franchises." *Id.* The court concluded that the New Jersey law should apply:

First, the parties provided in the agreement that it would be governed by the laws of the state of New Jersey. It is well established that when the parties to a contract have indicated their intention as to the law which is to govern, it will be governed by such law in accordance with the intent of the parties.

In addition to the express intent of the parties, a reasonable relationship to New Jersey is shown in the agreement itself. . . .

Next, there is no evidence that the New Jersey legislature intended to restrict the application of this statute or to prevent its own citizen, [Mercedes Benz], from making New Jersey law applicable to this contract. *Since [Mercedes Benz], a New Jersey resident, contracted in New Jersey to have New Jersey substantive law apply to it, it cannot now be heard to complain about the extraterritorial application of the act.*

*Id.* at 629–30 (citations omitted) (emphasis added).

Based on the above language and the Court's analysis, this Count is not dismissed.[26]

8. Count XVI: Negligent Misrepresentation—# 6470

Count XVI alleges that BKC negligently misrepresented the allegations complained

---

**24.** If the Florida legislature had included a phrase that specifically limited the Florida Franchise Act's application to Florida residents or domiciliaries, the Court would not have determined that the Act was applicable to this contract, i.e. the parties' intent in including a choice of law provision in a contract cannot be used to override the clear intention of the legislature.

**25.** Other courts faced with this problem have invalidated parties' choice of law clauses for public policy reasons. *See, e.g., Winer Motors, Inc. v. Jaguar Rover Triumph, Inc.,* 208 N.J.Super. 666, 506 A.2d 817 (1986).

**26.** BKC also claims that defendants "have failed to allege the requisite elements of a cause of action under [§] 817.416." The Court disagrees.

**1024**

of in Count XV, namely, "misrepresenting the chances for success of Franchise # 6470;" "failing to disclose the known required total investment for Franchise # 6470," and/or "misrepresenting [BKC's] efforts to sell or establish more ... restaurants in the ... market area of Franchise # 6470 than was reasonable."[27] BKC claims that such alleged misrepresentations are not actionable.

■ The law of negligent misrepresentation is similar under either Florida or Georgia law. *See Hasenfus v. Secord,* 962 F.2d 1556, 1561 (11th Cir.1992) (Florida law); *Horizon Fin., F.A. v. Hansen,* 791 F.Supp. 1561, 1574 (N.D.Ga.1992) (Georgia law). Negligent misrepresentation is similar to fraud, except that it involves negligent failure to ascertain the truth or falsity of a representation, rather than knowledge that such representation is false.

■ In *Bissett v. Ply–Gem Indus., Inc.,* 533 F.2d 142 (5th Cir.1976), the Fifth Circuit interpreting Florida law found that "projections of future profits or business success" may constitute fraud. *Id.* at 146; *see also Varnum v. Nu–Car Carriers, Inc.,* 804 F.2d 638, 641–42 (11th Cir.1986) (concurring op.), *cert. denied,* 481 U.S. 1049, 107 S.Ct. 2181, 95 L.Ed.2d 838 (1987). The court classified such representations as "expressions of opinion [that] can be actionable if the declarant had exclusive or superior knowledge of the facts underlying the opinion.... [A] plaintiff may recover upon a showing that the defendant knew, or should have known, that the facts in his possession invalidated the opinion which he expressed." *Bissett,* 533 F.2d at 146 (citations & footnotes omitted).[28] Based on *Bissett,* it appears that the first type of mis-

representation is actionable, i.e. negligent misrepresentations regarding Franchise # 6470's "chances for success."

The second alleged negligent misrepresentation is for "failing to disclose the known required total investment for Franchise # 6470." This type of misrepresentation also appears actionable. It would clearly be material to a franchisee, and it would be the type of information that Austins would not have "an equal opportunity to become apprised of."

The third alleged misrepresentation reads as follows: "misrepresenting BKC's efforts to sell or establish more Burger King restaurants in the market and market area of Franchise # 6470 than was reasonable for BKC to expect could be sustained in such market and market area." While this allegation is a bit unclear, it appears that Austins are alleging that BKC misrepresented to the Austins the number of restaurants that it was going to open in Atlanta, presumably by understating such number.[29] Based on *Bissett,* the Court finds that this allegation is actionable.

Based on the above, the Court does not dismiss this Court at this stage of the litigation (i.e. Motion to Dismiss).

9. Count XVII: Breach of the Implied Covenant of Good Faith in the NDTL Agreement

■ Count XVII of the Amended Counterclaim alleges that BKC "materially breached the implied covenant of good faith and fair dealing in the NDTL Agreement by failing to provide consistent and honest advice to [Austins] with respect to the viability of the South Cobb Drive Site."

27. In Count XVI, Austins state that "BKC negligently made the above-stated misrepresentations," apparently referring to the "misrepresentations" contained in Count XV. The Court reviews this Count accordingly.

28. The law in Georgia regarding such misrepresentations appears similar.
 Representations under the general head of 'dealer's talk' are regarded as mere commendations, 'puffing,' or expressions of opinion, and do not, though untrue, constitute false representations which will avoid a contract.... The representations to support a

claim must relate to an existing fact and not a future event, *unless it be an event which the party making the representations knows will never occur.* Mere broken promises, unfulfilled predictions, and erroneous conjectures do not meet this test.
*American Food Serv., Inc. v. Goldsmith,* 121 Ga.App. 686, 175 S.E.2d 57, 59 (1970) (emphasis added) (citation omitted).

29. The Court is unclear as to why Austins have included the second portion of this allegation beginning with "than."

After detailing allegations regarding BKC's expressed concerns of cannibalization of Austin's proposed restaurant location by two nearby company-owned stores, Austins allege that BKC never advised them that the Site would not be able to achieve the sales forecasts that BKC had prepared.

The Court does not find that these allegations trigger any breach of the implied covenant of good faith. Rather, they involve allegations of an express breach of the NDTL Agreement as alleged in Count XIII and allegations of misrepresentation as alleged in Count XVI. Accordingly, Count XVII is hereby DISMISSED.

### III. MOTION TO STRIKE DEFENDANTS' PRAYER FOR DAMAGES

BKC has moved to strike Austins' prayer for punitive damages and certain compensatory damages.

#### A. *Punitive Damages*

BKC moves to strike Austins' prayer for punitive damages because: (1) Austins' allegations of fraud, by themselves, are insufficient to support a punitive damage award; (2) Punitive damages are unavailable under the Florida Franchise Act.[30]

 Punitive damages are available under Florida law "only upon a showing that the act complained of is characterized by 'willfulness, wantonness, maliciousness, gross negligence or recklessness, oppression, outrageous conduct, deliberate vio-

lence, moral turpitude, insult, or fraud.' " *Cook v. Deltona Corp.,* 753 F.2d 1552 (11th Cir.1985) (quoting 17 Fla.Jur.2d *Damages* § 119 (1980)).

"Malice ... is not simply the doing of an unlawful act or injurious act, it implies that the act complained of was conceived in the spirit of mischief or criminal indifference to civil obligations." *Genesis Publications, Inc. v. Goss,* 437 So.2d 169 (Fla.3d DCA 1983). "The terms 'punitive' and 'vindictive' are used interchangeably." *Ellis v. Golconda Corp.,* 352 So.2d 1221, 1225 (Fla.1st DCA 1977) (citing *Murphy v. Hobbs,* 7 Colo. 541, 5 P. 119 (1884)). Such damages "are recoverable only against defendants whose wrongful conduct is particularly reprehensible." *Schief v. Live Supply, Inc.,* 431 So.2d 602, 603 (Fla.4th DCA 1983). *G.M. Brod & Co. v. U.S. Home Corp.,* 759 F.2d 1526, 1536 (11th Cir.1985).

 Here, the only Count remaining for which punitive damages is alleged is Austins' claim of negligent misrepresentation of certain material facts in Count XVI. While it does not appear that this claim will support a punitive damage claim, the Court cannot conclusively state that such claim does not involve the type of "gross negligence" referred to above at the motion to dismiss stage of this litigation.[31] Accordingly, we do not strike Austins' claim for punitive damages for negligent misrepresentation at this time.

 The Court agrees with BKC that punitive damages are unavailable under the Florida Franchise Act. Fla.Stat. § 817.-

---

**30.** In its Reply, BKC acknowledged this Court's ruling in *State of Wis. Inv. Bd. v. Plantation Square Assoc., Ltd.,* 761 F.Supp. 1569, 1576 (S.D.Fla.1991), holding that Fla.Stat. § 768.72 is inapplicable to federal diversity actions.

Because the Court has dismissed Count III for Conversion and Count XIV for Intentional Fraud, punitive damages relating to such Counts are unavailable. BKC also moved to strike Austins' punitive damage claim for Count XII—Promissory Estoppel because such claim is "the equivalent of a breach of contract action and ... punitive damages may not be awarded under Florida law for a breach of contract action." Because the Court has converted BKC's Motion to Dismiss into a motion for summary judgment on this Count, the Court does not address this

issue at this time. However, we note that punitive damages are recoverable in Florida for contract claims if there is an accompanying independent tort. *Homeco Dev. v. Markborough Properties, Ltd.,* 709 F.Supp. 1137, 1140 (S.D.Fla. 1989); *see also, Serina v. Albertson's, Inc.,* 744 F.Supp. 1113, 1116 (M.D.Fla.1990) (concluding that the facts in the breach of contract and independent tort may be "interlaced," yet limiting recovery because of the "economic loss rule.")

**31.** A claim of negligent misrepresentation that resembles fraud in the inducement may support a claim for punitive damages. *See John Brown Automation, Inc. v. Nobles,* 537 So.2d 614, 617–618 (Fla.App.Dist.1988).

416(3) explicitly permits one who demonstrates a violation under the Act to recover "all moneys invested in such franchise or distributorship" plus "reasonable attorney's fees."

### B. *Compensatory Damages*

The Court agrees with BKC that dismissal of BKC's complaint is not a proper remedy for Austins. Therefore, that portion of Austins' prayer for relief is STRICKEN.

In addition, BKC correctly notes that a judgment relieving Plaintiff Loretta Austin of her obligation under Note # 3754 and Equipment Lease # 6470 is not a proper remedy for Austins because said financing agreements were entered into with third parties not party to the instant lawsuit. Austins argue that "to the extent that [their claims for release of the L. Austin's obligations] may be viewed as claims for indemnification and/or contribution from the Plaintiff for the Plaintiff's own wrongdoing, they are certainly valid." As Austins' have not plead a claim for indemnification or contribution, this portion of Austins' prayer for relief is hereby STRICKEN.

### IV. APPEAL FROM MAGISTRATE'S ORDER

Austins' filed an Appeal from Magistrate Judge Bandstra's Order dated November 30, 1990 that states, in relevant part, that "Discovery in this case shall be limited to Burger King restaurants # 3754 and # 6470 and all issues raised in the pleadings with respect to these franchises and these franchises only."

The Court agrees with Austins that, in light of this Order, there are certain issues involving the Burger King System that extend beyond Burger King restaurants # 3754 and # 6470. For example, in Counts I and II, Austins' allege that Burger King substantially damaged the BKC System and value of the BKC Marks in 1989. Counts IV and V, which involve a breach of the implied covenant of good faith as it relates to advertising obligations, also appear to involve issues beyond Franchises # 3754 and # 6470. Ac-

cordingly, said Appeal is GRANTED and the Magistrate's Order is set aside.

Rather than reinstate Austins' previous discovery request, however, the Court suggests that Austins submit a renewed discovery request to BKC (and file it with the Court) that is tailored as narrowly as possible and is guided by the principles enunciated in this Order. BKC then may file an additional motion for a protective order, if it believes that one is necessary.

### V. CONCLUSION

In summary, BKC's Motion to Dismiss is GRANTED as to Counts III, VI, VII, VIII, IX, XIV, and XVII and DENIED as to Counts I, II, IV, V, X, XI, XIII, XV, and XVI. Allegations Five and Six in Count I are STRICKEN. In addition, Count XII is converted into a Motion for Summary Judgment, as discussed above.

Austins' prayer for punitive damages as to all claims except for negligent misrepresentation is hereby STRICKEN. Austins claim for compensatory damages relating to dismissal of BKC's Complaint and payment of Loretta Austin's obligations (under specified financing arrangements with a third party lender) is hereby STRICKEN.

Finally, Austins' Appeal of Magistrate's Order of November 30, 1990 is GRANTED. Austins' should resubmit a discovery request to BKC as outlined above.

DONE and ORDERED.